[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 331 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 332 
This action was begun on February 24, 1940, by Hotel and Restaurant Employees' International Alliance, Local No. 122, Phil L. Valley, John Alexander, and Jack Heisdorf, each individually, as business agent, organizer, and vice-president, respectively, for and as representatives of all the members of Hotel and Restaurant Employees' International Alliance, Local No. 122; International Laundry Workers, Local No. 174; Bartenders International League of America, Local No. 64; International Union Operating Engineers, Local No. 311; Milwaukee Building Trades Council, all affiliated with the American Federation of Labor, petitioners, against Wisconsin Employment Relations Board, Henry C. Fuldner, individually and as chairman of, L. E. Gooding, individually and as a member of, R. Floyd Green, individually and as a member of the Wisconsin Employment Relations Board, and Plankinton House Company, a corporation, defendants, to review the findings, orders, and decisions made by the Wisconsin Employment Relations Board in the proceeding before that board, entitled Plankinton House Company, a Wisconsin corporation, complainant, *Page 333 
v. Hotel and Restaurant Employees' International Alliance, Local No. 122, and others, respondents, the findings having been made by the Wisconsin Employment Relations Board, hereinafter referred to as the "board," on February 15, 1940. The matter was heard by the court, and on May 14, 1940, the court ordered and adjudged that the findings and conclusions of the board complained of be in all respects sustained, confirmed, and enforced. From this judgment the petitioners appeal.
Inasmuch as only questions of law are raised upon this appeal we shall state only so much of the facts as are material to an understanding of these questions. The petitioners are certain labor unions described above together with individuals, personally and as agents and officers of said unions. The defendants are the Wisconsin Employment Relations Board and the Plankinton House Company. On the 16th day of June, 1938, the Plankinton House Company entered into a collective-bargaining contract with the unions, which contract covered wages, hours, and working conditions governing employees of the Plankinton House Company employed at the Plankinton House and the Kilbourn Hotel, and provided as a condition of such employment that all employees coming within the terms of said contract must be and remain members of one of the respective unions so long as employed by the Plankinton House Company.
It was further provided that said contract was to continue for one year ending on the 15th day of June, 1939, and for consecutive one-year renewals unless either party served notice in writing on the other party at least thirty days before the expiration of such year that such party desired to terminate the contract at the end of the contract year. There was also a provision for notice of continuance and a provision for subsequent negotiations. The unions served notice of continuance on May 15, 1939, but desired to *Page 334 
negotiate for improved hours, wages, and working conditions. The Plankinton House Company served notice that it desired to continue the contract for another year and desired to negotiate. Negotiations between the parties failed, arbitration was had in accordance with the terms of the contract, and on October 30, 1939, the Plankinton House Company gave notice of its willingness to execute a contract in accordance with the terms of the arbitration award. On November 2, 1939, in the afternoon, the employees of the company at both the Plankinton House and Kilbourn Hotel went on strike. Prior to calling such strike the employees did not vote by secret ballot to call such strike. Immediately after the strike was called, picketing was engaged in at the three entrances to the Plankinton House. Picketing was carried on by the members of all of the unions involved, and pickets carried banners bearing the names of all petitioning unions. The business manager of the Hotel and Restaurant Employees' International Alliance, Local No. 122, notified Marquette University and the Milwaukee School of Engineering that all students working at the Plankinton House for their meals immediately discontinue such work, and that unless such students did discontinue such work the union would be forced to stop the employment of such students working at other hotels and restaurants in the city of Milwaukee which had collective-bargaining contracts with Local No. 122; that ever since the strike the Plankinton House and the Kilbourn Hotel have continued to operate with new employees replacing the striking employees.
On November 4, 1939, union pickets by means of force prevented the delivery of floral decorations to the Plankinton House; that as a result of the altercation, Jack Heisdorf, vice-president of Local No. 122, and Charles McLaughlin, assistant to the secretary of Local No. 122, were arrested, convicted, and paid fines. Charles McLaughlin returned to *Page 335 
the picket line immediately after his arrest, and on November 17, 1939, assaulted one Lester Raasch, an employee of the Plankinton House and was again arrested, convicted, and fined. Other fines were paid under similar circumstances by other striking employees and by pickets employed by the union. Convictions were had therefor.
Upon the basis of its findings of fact, the board found as conclusions of law and made the following order:
"1. That the contractual relationship existing between the Plankinton House Company and the respondent unions was terminated by the respondent unions on the 2d day of November, 1939, by the refusal of said unions to accept the award of the board of arbitration, and their act of calling a strike at the Plankinton House and the Kilbourn Hotel.
"2. That the respondent unions are guilty of unfair labor practices by co-operating and engaging in promoting and inducing picketing and boycotting, all being overt concomitants of a strike, without first obtaining the approval of the majority of the employees of the Plankinton House Company by a secret ballot.
"3. That all of the former employees of the Plankinton House Company who went out on strike and who remained out on strike, have been parties to an unfair labor practice by co-operating and engaging in a strike without first obtaining the approval of a majority of such employees.
"4. That the following-named persons, by reason of threats and assaults made by them to and on employees of the Plankinton House or persons seeking to do business with the Plankinton House, or by misdemeanors committed by them arising out of the controversy between the respondent unions and the, complainant, Plankinton House Company, are guilty of unfair labor practices: Phil L. Valley, Jack Heisdorf, Charles McLaughlin, Charles Alden, James C. O'Brien, John Thomas O'Maher, Joseph Hofich and Thomas James.
"Upon the basis of the foregoing findings of fact and conclusions of law the board, pursuant to section 111.07 (4) of the Wisconsin Statutes, makes the following *Page 336 
 "ORDER.
"It is ordered that the respondent unions, Hotel and Restaurant Employees' International Alliance, Local No. 122, International Laundry Workers, Local No. 174, Bartenders International League of America, Local No. 64, International Union Operating Engineers, Local No. 311, and the Milwaukee Building Trades Council, the officers, members, agents, successors and assigns of each, shall:
"1. Immediately cease and desist from:
"(a) Engaging in promoting or inducing picketing at or near the Plankinton House or the Kilbourn Hotel;
"(b) Attempting to hinder or prevent by threats, intimidation, force or coercion of any kind the pursuit of lawful work by employees of the Plankinton House Company;
"(c) Boycotting in any way the Plankinton House Company.
"2. Take the following affirmative action, which the board finds will effectuate the policies of the act:
"(a) Post notices to their members in conspicuous places at the union headquarters that the union has ceased and desisted in the manner aforesaid, and that all officers, members and agents of the union are to refrain from engaging in promoting or inducing picketing and boycotting of the Plankinton House Company, and also to refrain from attempting to hinder or prevent by threats, intimidation, force or coercion of any kind the pursuit of lawful work by employees of the Plankinton House Company;
"(b) Notify the board in writing forthwith that steps have been taken by each of the respondent unions to comply herewith."
With its answer to the petition to set aside and vacate the order, the board filed a petition and cross complaint asking that the court enter an order confirming and enforcing all of the provisions of its order as amended. The petition and cross complaint having been brought on for hearing, the court by its judgment sustained the findings of the board, and a judgment was entered accordingly sustaining, confirming, and enforcing the order. *Page 337 
The following opinion was filed November 8, 1940:
By ch. 57, Laws of 1939, the legislature repealed ch. 111 of the statutes of 1937 and created a new chapter to be designated ch. 111. We shall state only so much of this chapter as is necessary to present the questions to be considered. The chapter provides that it may be cited as the Employment Peace Act.
Sec. 111.01, Stats. 1939, declares the public policy of the state as to employment relations and collective bargaining. It recognizes that there are three major interests involved, namely, that of the public, the employee, and the employer.
Sec. 111.02, Stats. 1939, defines certain terms used in the chapter:
"(5) `Collective bargaining' is the negotiating by an employer and a majority of his employees in a collective-bargaining unit (or their representatives) concerning representation or terms and conditions of employment of such employees in a mutually genuine effort to reach an agreement with reference to the subject under negotiation.
"(6) The term `collective-bargaining unit' shall mean all of the employees of one employer (employed within the state), except that where a majority of such employees engaged in a single craft, division, department or plant shall *Page 338 
have voted by secret ballot as provided in section 111.05 (2) to constitute such group a separate bargaining unit they shall be so considered. Two or more collective-bargaining units may bargain collectively through the same representative where a majority of the employees in each separate unit shall have voted by secret ballot as provided in section 111.05 (2) so to do. . . .
"(8) The term `labor dispute' means any controversy between an employer and the majority of his employees in a collective-bargaining unit concerning the right or process or details of collective bargaining or the designation of representatives. Any organization with which either the employer or such majority is affiliated may be considered a party to the labor dispute."
Sec. 111.06, Stats. 1939, defines what are unfair labor practices:
"(1) [Not involved here.]
"(2) It shall be an unfair labor practice for an employee individually or in concert with others: . . .
"(e) To co-operate in engaging in, promoting or inducing picketing, boycotting or any other overt concomitant of a strike unless a majority in a collective-bargaining unit of the employees of an employer against whom such acts are primarily directed have voted by secret ballot to call a strike. . . .
"(3) It shall be an unfair labor practice for any person to do or cause to be done on behalf of or in the interest of employers or employees, or in connection with or to influence the outcome of any controversy as to employment relations any act prohibited by subsections (1) and (2) of this section."
While the briefs on both sides contain much matter relating to the history, background, and philosophy of labor legislation, the sole contention made here is that sub. (2) (e), sec. 111.06, Stats. 1939, is unconstitutional and void, (1) because it contravenes the guaranties of free speech afforded by the Fourteenth amendment to the constitution of the *Page 339 
United States and section 3 of article I of the constitution of the state of Wisconsin; (2) because it does not constitute a valid exercise of the police power of the state since it is for the vindication of a private right and not a public right; (3) because it is indefinite and uncertain because it establishes no means or standards wherein and whereby the requisite balloting can be conducted and the results thereof ascertained, and is therefore incapable of application; and (4) because the terms "picketing" and "boycotting" are vague and indefinite; their use in the statute and order is not sufficient to apprize the unions as to what conduct is or is not prohibited.
In order to determine whether the Employment Peace Act is unconstitutional, it must first be construed. Petitioners argue that under the provisions of sub. (2) (e), of the act, sec. 111.06, Stats. 1939, and the order issued by the board pursuant thereto that individual employees are forbidden as individuals to do any of the things enumerated in the subsection except in support of an authorized strike. The legislature has very carefully and explicitly set out as an aid in the construction of the act what it intended to do in its declaration of policy. In addition to that, sec. 111.15, Stats. 1939, provides:
"Except as specifically provided in this chapter, nothing therein shall be construed so as to interfere with or impede or diminish in any way the right to strike or the right of individuals to work; nor shall anything in this chapter be so construed as to invade unlawfully the right to freedom of speech. And nothing in this chapter shall be so construed or applied as to deprive any employee of any unemployment benefit which he might otherwise be entitled to receive under chapter 108 of the statutes [unemployment benefits]."
The legislature also amended ch. 103, Stats., entitled "Employment Regulations," but did not amend or repeal sec.103.53, Stats., which makes lawful the doing of certain *Page 340 
things in labor disputes. It also redefined the term "labor dispute" as found in ch. 103, as follows:
"103.62 (3) The term `labor dispute' means any controversy between an employer and the majority of his employees in a collective-bargaining unit concerning the right or process or details of collective bargaining or the designation of representatives. Any organization with which either the employer or such majority is affiliated may be considered a party to the labor dispute. The provisions of this subsection shall supersede any provision of the statutes in conflict therewith."
The act also established rules for determining when a case shall be held to involve or grow out of a labor dispute. The definition of "labor dispute," and the rules for determining when a case shall be held to involve or grow out of a labor dispute contained in ch. 57, Laws of 1939, are widely different in theory and purpose from like provisions to be found in the statutes of 1937, which they supplanted. Ch. 57 limits a labor dispute to a case where there is a controversy between an employer and a majority of his employees in a collective-bargaining unit. The definition contained in sec. 103.62 (3), Stats. 1937, was very much broader and much more inclusive than that contained in sec. 103.62 (3), Stats. 1939.
Upon the oral argument great stress was laid upon the fact that according to the terms of the act an employee was deprived of his constitutional right of freedom of speech. Appellants support their contention in this regard by reference to the case of Thornhill v. Alabama (1940), 310 U.S. 88,60 Sup. Ct. 736, 84 L.Ed. 1093. Counsel, however, ignore the fact that the Thornhill Case dealt with a statute which prohibited loitering or picketing and declared picketing to be a misdemeanor. As construed by the state court it prohibited the publicizing of the facts of a labor dispute whether by printed sign, by pamphlet, by word of mouth, or *Page 341 
otherwise. The peace act deals with concert of action in carrying on an unauthorized strike by the usual overt acts concomitant of a strike.
The peace act, however, does not forbid picketing. It attempts to regulate it and to provide under what conditions and circumstances picketing may be carried on by striking employees. The peace act expressly provides that it shall not be so construed as to impair the right of free speech. One violating the provisions of the peace act is not guilty of a misdemeanor. His act is merely declared to be an unfair labor practice. The right to speak freely is guaranteed by the constitution, but that right, the same as other rights guaranteed by the constitution, is subject to limitations. In the exercise of that right one is not free from liability for libel, duress, or fraud, although speech was the agency in each case. John F. Jelke Co. v. Beck (1932), 208 Wis. 650,242 N.W. 576; Wisconsin Labor R. Board v. Fred Rueping L.Co. (1938) 228 Wis. 473, 279 N.W. 673. See also Schenckv. United States (1919), 249 U.S. 47, 39 Sup. Ct. 247,63 L.Ed. 470; Gitlow v. New York (1925), 268 U.S. 652,45 Sup. Ct. 625, 69 L.Ed. 1138.
The act does not limit the right of an employee to speak freely. It declares co-operating in "engaging in, promoting or inducing picketing, boycotting," etc., in aid of an unauthorized strike, to be an unfair labor practice. The fact that an employee in the course of doing the designated acts may use speech as a means of carrying on his activities, does not bring the acts within the protection of the constitutional guaranties of free speech. The term "picketing," as used in sub. (2) (e), sec. 111.06, Stats. 1939, does not include acts held in the Thornhill Case, supra, to be within the protection of the constitutional guaranty of the right of free speech. The express language of the act forbids such a construction. It clearly refers to that kind of picketing which the *Page 342 Thornhill Case says the state has power to deal with "as a part of its power to preserve the peace, and protect the privacy, the lives and the property of its residents."
Par. (e) by its terms does not apply to an individual. An individual cannot co-operate with himself. Par. (e) does not forbid an employee to quit his employment individually or in concert with others. It does not forbid an employee singly or in concert with others from bringing about a vote by a collective-bargaining unit as to whether there shall be a strike. By the act strikes are divided into two classes, — authorized and unauthorized. Par. (e) has no application except in the case of an unauthorized strike. It is the act of co-operating in engaging in, promoting or inducing picketing, boycotting, or other overt acts in support of an unauthorized strike that par. (e) declares to be an unfair labor practice. Nowhere in the act is it declared that engaging in, promoting, or inducing picketing, boycotting, or any other act concomitant of a strike shall be deemed to be an unlawful act. It is declared merely to be an unfair labor practice. Our attention has been called to a decision of the supreme court of the state of Oregon, American Federation of Labor v. Bain
(Or.), 106 P.2d 544, decided October 22, 1940. The statute under consideration in that case was widely different from ch. 111, Stats. 1939. In construing this statute the supreme court of Oregon said (106 P.2d 544, 554):
"In the statute there is no definition of the word `picket.' It is a word of `vague contours,' as the supreme court said in the Thornhill Case, and doubtless may be used to indicate conduct of a noxious character with which the state has power to deal. But it also embraces activities which the supreme court holds the state may not lawfully suppress. It includes, we think, the conduct of one who walks or patrols in the vicinity of a place of business involved in a labor dispute, and by word of mouth, banner or placard, undertakes to give information to the public concerning such dispute. The conduct of such person may be peaceful or otherwise; his *Page 343 
demeanor orderly or threatening; the information true or false. The activity may be, and usually is, incident to an organized effort to prevail in the controversy, and we concur in the view of counsel for the defendants that it was precisely picketing by a member of a labor union and on behalf of his organization that the voters had in mind when they enacted this law. But that the activities embraced by the word `picket' were intended to include such as are free from violence, intimidation and fraud, — what is ordinarily called `peaceable picketing' — we think there can be no doubt. It follows that the very type of conduct which the supreme court held in the Thornhill and Carlson Cases to be protected by the Fourteenth amendment, is denounced by the Oregon statute unless engaged in incident to a controversy relative to wages, hours or working conditions, between an employer and a majority of his employees."
As already pointed out, the Wisconsin statute expressly provides that it shall be so construed and applied that it shall not interfere with the right of free speech. As we understand and construe the statute, the right of free speech is not interfered with. The conduct complained of in this case, and described as "picketing," was not the sort of conduct that was indulged in by the defendant in the Thornhill Case, supra. The conduct complained of in this case and dealt with by the board and by the court was of an entirely different character. It was mass picketing, organized and carried on by the unions supplemented by boycott and violence, and was clearly within the exception stated in the Thornhill Case warranting state action. In that case the supreme court of the United States said (p. 105):
"We are not now concerned with picketing en masse or otherwise conducted which might occasion such imminent and aggravated danger to these interests as to justify a statute narrowly drawn to cover the precise situation giving rise to the danger."
Ch. 111, Stats. 1939, is a statute of that character. We do not understand the decisions of the United States supreme *Page 344 
court to mean that there can be no regulation of the right of picketing. That court has not yet said that a person who goes upon the premises of another for the purpose of creating a disturbance and disorganizing the other's business, is protected in the doing of such acts by the constitutional guaranty of free speech. In this case it is undisputed that numerous assaults were committed by pickets; that the pickets acted in concert; that the fines of these pickets were paid by the unions; that ingress and egress to and from the premises of the employer were prevented by force and arms. It was at conduct of that kind that the statute was aimed. It is conduct of that kind that is dealt with in this case. It is conduct of that kind that is declared to be an unfair labor practice by the statute, and from which the defendants are ordered to cease and desist. The statute does not even declare conduct of that kind to be unlawful, nor does it subject the offender to a criminal prosecution. In this respect it differs fundamentally from the statute that the Oregon supreme court had under consideration.
The effect of pursuing a course of conduct which under the statute amounts to an unfair labor practice is:
(1) To subject the actor to the provisions of sec. 111.07, Stats. 1939. Under it he may upon complaint be brought before the board where he may answer the complaint and appear in person or otherwise at the hearing, of which a full and complete record is required to be kept. After the final hearing the board is required promptly to make and file its findings. The board may by its final order dismiss the charges or require the person complained of to cease and desist from the unfair labor practice found to have been committed, suspend his rights of immunities, privileges, or remedies granted or afforded by the chapter for not more than a year, and require him to take such affirmative action, including reinstatement of employees with or without pay, as the board *Page 345 
may deem proper. The determination of the board may be enforced by the judgment of the circuit court.
(2) When a person is found guilty of an unfair labor practice he loses the benefit of sec. 103.53, Stats. 1939, which prescribes what acts, whether performed singly or in concert, shall be legal in the conduct of a labor dispute. He is thereby remitted to, his rights under the constitution, other statutes, and the common law. this is recognized in sec. 111.07 (1), which provides, in part:
"Nothing herein shall prevent the pursuit of legal or equitable relief in courts of competent jurisdiction."
This exception, of course, applies to the employee, employer, or any person connected with a particular controversy as described in sec. 111.06 (3), Stats. 1939.
(3) An employee who is guilty of an unfair labor practice may lose his status as an "employee" as defined in sec. 111.02
(3), Stats. 1939.
No rights of a person guilty of an unfair labor practice are invaded until there has been a final determination by the board. The statute is not self-executing. It merely provides the machinery by which certain described labor practices may, after due hearing, be held to be unfair, and the person complained of ordered to cease and desist therefrom. Nothing in the act prevents or was intended to prevent employees from making such demands upon their employer as they think the circumstances warrant. Whether such employees act singly or in concert they are within their rights in making such demands upon their employer. We find nothing in the act which prevents a minority of a collective-bargaining unit from withdrawing from employment either singly or in concert. They are not guilty of an unfair labor practice in so doing. But if they attempt to coerce their employer by concerted picketing, a boycott, or by any other similar overt act *Page 346 
concomitant of a strike, they will be guilty of an unfair labor practice as defined in the act. We say similar overt act because the maxim of ejusdem generis applies. Chicago N.W. R. Co. v. Railroad Comm. (1916) 162 Wis. 91,155 N.W. 941.
The petitioners complain that the characterization of the acts of employees as unfair labor practices cannot be made to depend on the action of a majority of a collective-bargaining unit; that the legislature cannot place it within the power of a majority of the collective-bargaining unit to authorize a strike. This argument is an attack upon a principle which is fundamental in the attempt of the legislature and of congress to regulate labor relations. The principle upon which authorized collective bargaining depends is that the rule of the majority within an appropriate collective-bargaining unit shall bind the minority. We see no way by which the principle of collective bargaining can be maintained unless this right of a majority of a collective-bargaining unit to speak for the unit including the minority is maintained. A bargain on behalf of a collective-bargaining unit amounts to nothing, if after it is made the individuals or some of them comprising that unit are not affected thereby. This principle is explicit in the National Labor Relations Act, in the Railway Labor Peace Act, and in the act now under consideration. If the majority of a collective-bargaining unit can thus coerce the minority in the matter of bargaining, we see no reason why the legislature may not vest in a majority of the unit power to determine whether such conditions obtain in the employment as warrant the calling of a strike in an effort to remedy them. There is no more delegation of legislative power in the one case than there is in the other. It is in most cases the same majority that made the bargain for the unit that determines whether a strike shall be called. We see in this no delegation of legislative power. Whether the conditions are such *Page 347 
in the employment as justify the employees in striking is a matter more particularly within the knowledge of the employees than anyone else, and is in the last analysis merely a question of fact. A vote of the majority of the employees in a collective-bargaining unit to strike is a determination that facts exist which justify it. When such a determination is made, sub. (2) (e), sec. 111.06, Stats. 1939, does not apply. The method of determining when a strike is justifiable is almost identical with the method provided for the submission to a municipality of whether a particular law shall be effective within that municipality. The electors determine upon the basis of their own knowledge whether conditions are such as to make the operation of the law within the municipality desirable and conducive to the general welfare. That also is a question of fact. When a majority have voted to call a strike, the means and methods of coercion which they may employ are not unlimited or unrestricted. Less than a majority may strike, but they will be under the restrictions of the statutes as to the methods of coercion which they may use. Sec.103.53 specifies with particularity what may be considered legal in the conduct of a labor dispute. These enumerated means striking employees not guilty of an unfair labor practice are at liberty to employ. Any court or judge is forbidden to restrain the doing of such acts when done in connection with a labor dispute. The sole difference between coercive acts in support of a strike which has been called by a majority of members of a collective-bargaining unit and one which has not been so called is that the members of a minority group do not have the benefit of sec. 103.53, that is, by indulging in an unauthorized strike they lose their privileges under that section and are subject to the provisions of ch. 111, Stats. 1939, relating to unfair labor practices. The character of their coercive acts must then be determined either by submitting the controversy to the board or by "the pursuit of *Page 348 
legal or equitable remedies in courts of competent jurisdiction." If one merely withdraws from his employment he is not subject to the act.
On behalf of the appellants fear is expressed that a —
"servile, docile or moribund majority refuses to place its stamp of approval, to grant a license, to the carrying on of peaceful, truthful appeals to the public."
This argument seems to disregard the fact that the question of whether intolerable working conditions, oppressive wages, or killing hours need correction is submitted to a majority of the group which must be suffering under these same conditions, the majority cannot by their action impose anything upon a minority that they do not by the same action impose upon themselves.
There is nothing in the history of the labor movement to warrant any fear that labor will be servile, docile, or moribund. On the contrary, no group within the body politic has shown itself more willing to stand upon its rights and sacrifice present advantage for future benefits than has labor.
The petitioners further contend that the cease-and-desist order is too broad; that even though the petitioners have been found guilty of unlawful labor practices in the conduct of their unauthorized strike, that all picketing and boycotting cannot be forbidden by the board, and cite as authority for their contention, May's Furs Ready-To-Wear, Inc., v.Bauer (1940), 282 N.Y. 331, 26 N.E.2d 279. The proceeding in the May's v. Bauer Case was one for injunctive relief. This contention is based on the assumption that the rules which apply to a court in granting injunctive relief apply in the hearing before the board. In the May's Case, the employer sought an injunction in a court of equity. The court said (p. 337):
"Upon this appeal there is involved the scope and application of a legislative enactment whose wisdom or lack of *Page 349 
wisdom is not a consideration open to judicial inquiry. Subject only to constitutional restrictions, it is the duty of this court to apply the statute as enacted by the legislature."
The question decided was that the statutes of the state of New York, providing that the court should not issue injunctions in a case growing out of a labor dispute except in accordance with the provisions of the statute, were controlling; that under the statute the court could not enjoin lawful acts committed in support of a strike. We have a similar statute in Wisconsin (sec. 103.56), but by sec. 111.17, Stats. 1939, it is provided that the provisions of ch. 111, Stats. 1939, shall prevail wherever they conflict with the provisions of other statutes. This court is under the same duty to declare the law in accordance with the provisions of ch. 111 that the court of the state of New York was under to declare the law in respect to injunctions in labor disputes and for the same reasons.
It is argued that the terms "picketing" and "boycotting" are so vague, indefinite, and uncertain as to render sub. (2) (e), sec. 111.06, Stats. 1939, void. In support of that argument cases relating to the construction of statutes defining criminal offenses are cited. Ch. 111, Stats. 1939, creates no criminal offenses. Violation of any of its terms does not subject the actor to criminal prosecution. The board is charged with the duty of enforcing the act. The power of the board relating to enforcement does not arise until some party in interest has filed a complaint in writing.
There can be no question but that the purpose of the legislature in enacting ch. 111, Stats. 1939, was widely different from the purpose which actuated it in the enactment of ch. 111, Stats. 1937, which was repealed. It appears from the briefs that much complaint was made because ch. 111, Stats. 1937, made no provision with respect to unfair labor practices by employees. In providing for "industrial peace, regular and adequate income for the employee, and uninterrupted *Page 350 
production of goods and services" (sec. 111.01 (2), Stats. 1939), we see no reason why the legislature may not forbid concerted picketing and boycotting in aid of an unauthorized strike. Under sec. 103.51 et seq., Stats. 1937, it was held that the plant of an employer might be picketed although there was no dispute between him and his employees and the employer employed no members of the union. American Furn. Co. v.I. B. of T. C. H. of A. (1936) 222 Wis. 338,268 N.W. 250. Under the same statute it was held that a labor union might conduct picketing operations for the purpose of coercing an employer to desist from performing work in his own business and in connection with projects undertaken by him. Sennv. Tile Layers Protective Union (1936), 222 Wis. 383,268 N.W. 270, 268 N.W. 872. It is apparent that the legislature was of the view that too wide a latitude was given to employees in their attempts to coerce their employers. All these questions relating to rights of employees to organize, conduct strikes, boycotts, and other coercive measures are in the field of public policy. As the court of appeals of New York said in the case already cited, and as this court has said many, many times, these questions are for the legislature. Courts do not sit to pass upon the wisdom or unwisdom of the acts of the legislature. In order to preserve order and prevent breaches of the peace, and assure to all citizens their lawful rights, the legislature may well forbid the doing of acts which under other circumstances would be lawful. The acts committed by the petitioners, as shown by the findings in this case, would have justified injunctive relief under the common law or any labor-relations statute, either state or federal.
While in the absence of legislation it was necessary for the court to declare public policy in controversies relating to labor relations, when the legislature acts within the constitutional limits of its power, its mandates supersede court decisions and control as to future controversies. Both parties to a labor dispute are under the same constitution and both are *Page 351 
subject to the valid acts of the legislature. Just where the line should be drawn in an effort to balance the bargaining power of the parties is primarily a matter of public policy for the legislature and not a question of law for the courts.
We discover no invasion of the right of freedom of speech either in sub. (2) (e), sec. 111.06, Stats. 1939, or in the way the law was administered by the board in this case. The right of the individual to freedom of speech is by the terms of the act left unimpaired. It is the right to concert of action that is regulated. Nor do we discover any such uncertainty or indefiniteness in the law as to, render it invalid. While it is true that the terms "picketing" and "boycotting" are not terms of definite legal content, they are descriptive of a process well known to the law, and when considered in connection with the other provisions of chs. 111 and 103, Stats. 1939, the meaning of these terms becomes reasonably certain.
The statute is one providing for the regulation and protection of civil rights, and therefore does not partake of the nature of a criminal statute. By engaging in an unauthorized strike an employee may lose his status as an employee. He then has the same rights and is subject to the same liabilities as a third person. When he thus withdraws from his employment he is free to speak, but his right to coerce his former employer is limited by the act. Except as his acts affect the employer he is under no restraint. It is true that the act limits the use of coercive measures as they have ordinarily been used in labor disputes, but that is a matter for the legislature. It is not within the province of the court to pass upon the wisdom or unwisdom of the public policy declared by the legislature.
Since we interpret the order of the board to be coextensive with the statute as construed, we find it unnecessary to modify the order or judgment.
By the Court. — Judgment affirmed. *Page 352 
The following opinion was filed January 7, 1941: