Retail Clerks' Union, Local No. 1403, A. F. L., and another, Appellants, vs. Wisconsin Employment Relations Board and others, Respondents.*

*September 14—December 11, 1942.*

* Motion for rehearing denied, with $25 costs, on February 9, 1943.

22

24

For the appellants there were briefs by *Flynn, Storms & Greenquist* of Racine, and *Padway & Goldberg* of Milwaukee, and oral argument by *I. E. Goldberg*.

For the respondent Wisconsin Employment Relations Board there were briefs by the *Attorney General, James Ward Rector,* deputy attorney general, *N. S. Boardman* and *Beatrice Lampert,* assistant attorneys general, and oral argument by *Mr. Boardman*.

For the respondents James C. Fridle, Warren Griffith, and Einer Lange there was a brief by *Beck, Smith & Heft* of Racine, and oral argument by *Carroll R. Heft.*

MARTIN, J. On February 5, 1941, James C. Fridle, Warren Griffith, and Einer Lange, employees of the Sears Roebuck Company's Racine store, in their own behalf, and in a representative capacity in behalf of all other·employees of said store, filed a complaint with the Wisconsin Employment

Relations Board, charging the appellant unions with unfair labor practices. Prior to December, 1940, Hal Norris and Dan Hubbard, the business agents of their respective unions, agreed to conduct a campaign to organize the retail stores throughout the city of Racine. They determined by lot—by drawing the name out of a hat—which of the two unions should organize a particular store. Said agents further agreed that if a store did not become organized they would picket that store.

In the latter part of November, 1940, Norris and Hubbard called on the manager of the store and obtained from him permission to post a notice in the store that a meeting would be held on the evening of December 3d, at Union hall, for the purpose of organizing the employees of the store into A. F. L., Local No. 1403. Such notice was posted on the store bulletin board on or about November 20th, with the consent and approval of the store manager. None of the store employees attended the meeting. No claim is made that the employer or any other person made any effort to prevent the store employees from attending the meeting. No further meeting of the employees was called by either union.

When Norris and Hubbard called on the manager of the store to get permission to post notice of the meeting to be held on December 3d, Norris told the manager that he "better have the men up at the meeting or else they would throw a picket line out." On December 4th Hubbard and Norris, in behalf of their respective unions, made arrangements for picketing the store. None of the store employees were members of either union. It is conceded that neither union had any dispute with Sears Roebuck & Company; also that there was no dispute between the company and its employees. All of the employees were satisfied with wages, hours, and working conditions.

The picketing began on December 4 or 5, 1940. The placards carried by the picketers bore the legend that the clerks in the store did not belong to the A. F. L. or C. I. O. For a time, at the beginning of the picketing, there were only two pickets at the front of the store and one at the rear entrance, or two pickets in front and a sign posted in the rear. For twelve or fifteen days before Christmas, 1940, the store was open evenings, during which time picketing was conducted by from two to twenty-six persons. During this time the pickets occupied the doorway entrance, making it difficult for customers to get through the picket line to enter the store. There was no violence on the picket line. One witness testified that a customer was tripped. Responsibility for placing the picket line was assumed by the business agent of A. F. L., Local 1403. Two members of the C. I. O. union from the Greene Manufacturing Company were required by their local to join the picket line on Saturday evening before Christmas as a penalty for having gone into the store while it was being picketed. The testimony of the business agents of both unions shows that a majority of the local unions affiliated with them have by-laws which prohibit their members under penalty, in some instances providing for a fine of $50, from patronizing a store which is being picketed.

Within a day or two after the picket line was established, A. F. L., Local 1403, notified other A. F. L. unions of its action and requested that they live up to their by-laws. In one instance the business agent of A. F. L., Local 1403, issued direct orders to a member of another local not to enter the store premises. The business agent of C. I. O., Local 184, reported the establishment of the picket line to the district council composed of representatives of various local C. I. O. unions.

Because of restrictions imposed upon members of the truck drivers' union, the store was unable to obtain delivery service. It could obtain no merchandise except such as was hauled in by employees in private automobiles. Coal could be obtained only by transporting it in bucketfuls in employees' automobiles. Such deliveries as were made to customers of the store had to be made by the same method. The Motor Transport Company refused to make deliveries to the store, giving as their reason that they had orders not to go through the picket line. The Chicago & North Western Railway also refused to make truck deliveries. Three companies requested to deliver coal replied that their trucks could not go through the picket line. Mr. Kenth, who had done regular trucking for the store prior to the establishment of the picket line, discontinued service shortly after picketing started. He testified that his reason for discontinuing service was that he was ordered to do so by Mr. Norris, business agent of A. F. L., Local 1403. He further testified that if he did so he would be subject to a $50 fine. Kenth gave the keys for his truck to the shipping clerk at the store. The business agent of the truck drivers' union testified that he removed the keys when the shipping clerk attempted to drive it. Certain members belonging to the Nash union, who were employed as extra workers at the store, reported that their unions would not permit them to enter the store to work.

One customer returned merchandise which he had purchased, giving as his reason that when he got to the door a picket told him that if he took it he would lose his job. On many occasions customers explained their failure to continue patronizing the store by saying that they could not come in. There was a decrease in the store's business, directly attributable to the picketing. A decrease in the store's business affects the compensation of the employees because they receive a bonus or commission, based on the amount of business done, in addition to their base pay.

The findings of fact made by the board, if supported by credible and competent evidence, are conclusive. Sec. 111.07 (7), Stats. The extent of the review by the courts is the same as that under the Workmen's Compensation Act, that is, there must be some evidence tending to support the finding of the board, and, if this is discovered, the court may not weigh the evidence to ascertain whether it preponderates in favor of the finding. *Wisconsin Labor R. Board v. Fred Rueping L. Co.* 228 Wis. 473, 493, 494, 279 N. W. 673. The drawing of inferences from the facts is a function of the board and not of the courts. *National Labor Board v. Link-Belt Co.* 311 U. S. 584, 597, 61 Sup. Ct. 358, 85 L. Ed. 368; *Wisconsin Labor R. Board v. Fred Rueping L. Co., supra.*

Intent, of course, can usually be shown only by actions. In *Singer Mfg. Co. v. National Labor Relations Board* (7th Cir.), 119 Fed. (2d) 131, 134, Cert. Den., 313 U. S. 595, 61 Sup. Ct. 1119, 85 L. Ed. 1549, with respect to determining whether collective-bargaining negotiations were carried on in good faith under the National Labor Relations Act, the court said:

"Existence or nonexistence of good faith, just as the existence and nonexistence of intent, involve only inquiry as to fact."

The only finding of fact challenged by appellants on the ground that it is not supported by the evidence is finding No. 16, which reads:

"Such picketing by the respondent [appellant] unions was carried on pursuant to a plan to injure the employees of the Sears Roebuck Company's Racine store by reducing the volume of business of such store and thus reducing the bonus each employee might be able to earn, with the intent that such injury would compel the employees of the store to join and assist one of the respondent unions against the will of the employees. It was also carried on with intent to injure the business of the employer with the purpose of coercing and inducing the employer to interfere with the right of the complainants and its other employees to refrain from joining or assisting either of the respondent unions."

The board had authority to determine, from the evidence and the legitimate inferences which the evidence warranted, whether the picket line in question was established solely for the purpose of advertising or whether it was established as a signal to set in motion a secondary boycott to injure the business of the store with the purpose of coercing and inducing the employer to interfere with the rights of its employees to refrain from joining or assisting either union. To engage in a secondary boycott is an unfair labor practice. Sec. 111.02 (12), Stats. 1939, defines it as follows:

"The term 'secondary boycott' shall include combining or conspiring to cause or threaten to cause injury to one with whom no labor dispute exists, whether by (a) withholding patronage, labor, or other beneficial business intercourse, (b) picketing, (c) refusing to handle, install, use or work on particular materials, equipment or supplies, or (d) by any other unlawful means, in order to bring him against his will into a concerted plan to coerce or inflict damage upon another."

Sec. 111.04, Stats. 1939, provides:

"Employees shall have the right of self-organization and the right to form, join or assist labor organizations, to bargain

collectively through representatives of their own choosing, and to engage in lawful, concerted activities for the purpose of collective bargaining or other mutual aid or protection; and such employees shall also have the right to refrain from any or all of such activities."

Sec. 111.06 (2), Stats. 1939, provides:

"It shall be an unfair labor practice . . . :

"(a) To coerce or intimidate an employee in the enjoyment of his legal rights, including those guaranteed in section 111.04, or to intimidate his family, picket his domicile, or injure the person or property of such employee or his family.

"(b) To coerce, intimidate or induce any employer to interfere with any of his employees in the enjoyment of their legal rights, including those guaranteed in section 111.04, or to engage in any practice with regard to his employees which would constitute an unfair labor practice if undertaken by him on his own initiative. . . .

"(e) To co-operate in engaging in, promoting or inducing picketing, boycotting or any other overt concomitant of a strike unless a majority in a collective-bargaining unit of the employees of an employer against whom such acts are primarily directed have voted by secret ballot to call a strike.

"(f) To hinder or prevent, by mass picketing, threats, intimidation, force or coercion of any kind the pursuit of any lawful work or employment, or to obstruct or interfere with entrance to or egress from any place of employment, or to obstruct or interfere with free and uninterrupted use of public roads, streets, highways, railways, airports, or other ways of travel or conveyance.

"(g) To engage in a secondary boycott; or to hinder or prevent, by . . . coercion . . . the obtaining, use or disposition of materials. . . ."

Appellants characterize findings No. 10, 11, 12, and 14 (see same printed in margin) as being immaterial. The truthfulness of these findings or the sufficiency of the evidence to sustain them is not challenged. Finding No. 10 is, in substance, that immediately after the picket line was formed, Norris, the business agent of A. F. L., Local 1403, in behalf of said local notified other A. F. L. unions of the establish-

ment of the picket line and requested them to live up to their by-laws; that the by-laws of the majority of both A. F. L. and C. I. O. unions prohibited their members from passing through picket lines. Finding No. 11 is to the effect that Hubbard, as business agent of C. I. O., Local 184, appeared at a meeting of the district council, which consisted of delegates from all local unions affiliated with the United Automobile Workers of America, affiliated with the C. I. O. in Racine, and advised the council that a picket line had been formed at the Racine store of Sears Roebuck Company. Finding No. 12 is to the effect that appellant unions employed professional pickets and also utilized the services of members of other unions, including two persons who were required to picket as a penalty for having gone through the picket line. Finding No. 14 is to the effect that Harold Kenth discontinued delivering merchandise for the Sears Roebuck store after the establishment of the picket line, and that he was ordered to do so by Mr. Norris, business agent of A. F. L., Local 1403, and by the business agent of his own union, Local 43, truck drivers' union; that both the Motor Transport Company and the Chicago & North Western Railway Company declined to make deliveries to the store. Referring to these findings, appellants say:

"These findings refer to actions of other persons and other organizations, not parties to the instant proceeding, and not acting in concert with the appellants, which actions have resulted in loss of patronage to the employer and loss of union trucking services."

These findings and finding No. 16 must be considered together in determining whether such findings support the board's conclusions and order. By its finding No. 16, quoted above, the board found that the picketing was carried on pursuant to a plan to injure the employees by reducing the volume of business of the store, thus reducing the bonus each employee might be able to earn, with the intent that such

injury would compel the employees to join and assist one of the unions against the will of the employees; that it was carried on with intent to injure the business of the employer and for the purpose of coercing and inducing him to interfere with the right of the complainants and the other employees to refrain from joining or assisting either of said unions.

After a very careful consideration of all the evidence, we are of the opinion that it supports the findings of the board. There can be no doubt that the picketing as carried on during the Christmas season of 1940, at times by as many as twenty-six pickets, and blocking the doorway entrance of the store so as to make ingress and egress difficult for those desiring to patronize the store, was clearly unlawful and could properly be enjoined; and any future recurrence of similar conduct may be enjoined. We think no one will question the right to enjoin those on the picket line from threatening and coercing customers of the store to the point of making them return merchandise purchases.

Appellants argue that the board did not find that there was a combination, conspiracy, or understanding between the appellant unions and other labor organizations in the city of Racine. The board did find specifically (finding No. 16) that "such picketing by the respondent [appellant] unions was carried on pursuant to a plan to injure the employees of the Sears Roebuck Company's Racine store. . . . It was also carried on with intent to injure the business of the employer with the purpose of coercing and inducing the employer to" commit an unfair labor practice.

Sec. 111.06 (3), Stats., makes it an unfair labor practice for any person (which term includes a labor union under sec. 111.02 (1)) to do or cause to be done any act prohibited by subs. (1) and (2) of sec. 111.06. That there was in the beginning a combination, conspiracy, or understanding between the appellants and other labor organizations in the city of Racine to injure both the employer and employees, to

coerce both through financial loss by setting in motion a concerted boycott of the Sears Roebuck Company store, is amply sustained by the evidence. The argument that it was the actions of other persons and other organizations not parties to the instant proceeding, and not acting in concert with the appellants, which resulted in the loss of patronage to the employer, is beside the point.

We do not hold that the appellant unions may not inform all other unions that a picket line has been established at the Sears Roebuck Company store and give the reasons why, or that they may not ask union members to live up to their by-laws and not go through the picket line. The appellant unions had the right to resort to such means and for such purpose as the law permits.

It is generally held that coercion or intimidation is not necessarily limited to threats of violence to person or property. A man may be coerced into doing or refraining from doing by fear of the loss of his business or wages as well as by the dread of physical violence or force. 6 A. L. R. 920; 116 A. L. R. 489. It is there said, 116 A. L. R. 489:

"That coercion is as easily accomplished without threats of violence as with them, and fear of loss or injury to business unless one submits to demands is as effective as fear of violence to his person." *A. & L. Mfg. Co. v. Carpenters' Council,* 308 Ill. 488, 139 N. E. 887; *Webb v. Cooks,' Waiters' & Waitresses' Union* (Tex. Civ. App.), 205 S. W. 465, 467; *Barr v. Essex Trades Council,* 53 N. J. Eq. 111, 30 Atl. 881; *Truax v. Corrigan,* 257 U. S. 312, 321, 328, 42 Sup. Ct. 124, 66 L. Ed. 254, 258, 260, 27 A. L. R. 375.

In *Wisconsin E. R. Board v. Milk, etc., Union,* 238 Wis. 379, 299 N. W. 31, there was, among other things, mass picketing, interference with delivery of materials, engaging in a secondary boycott, and attempting to induce the employer to enter into an all-union agreement when three fourths of the employees had not voted therefor. In the instant case there was mass picketing during the Christmas season of

1940; then and since there has been interference with delivery of materials to and from the store, engaging in a secondary boycott, and attempting to induce the employer to interfere with its employees in the exercise of their right to refrain from joining either of the appellant unions. The court sustained the order of the board in *Wisconsin E. R. Board v. Milk, etc., Union, supra.* The United States supreme court on *certiorari* refused to take jurisdiction of the case.

Peaceful picketing is now recognized as an exercise of the right of free speech and therefore lawful. *Thornhill v. Alabama,* 310 U. S. 88, 60 Sup. Ct. 736, 84 L. Ed. 1093; *Carlson v. California,* 310 U. S. 106, 60 Sup. Ct. 746, 84 L. Ed. 1104; *American Federation of Labor v. Swing,* 312 U. S. 321, 61 Sup. Ct. 568, 85 L. Ed. 855; *Milk Wagon Drivers Union v. Meadowmoor Dairies, Inc.,* 312 U. S. 287, 61 Sup. Ct. 552, 85 L. Ed. 836; *Bakery & Pastry Drivers & Helpers Local v. Wohl,* 315 U. S. 769, 62 Sup. Ct. 816, 86 L. Ed. 1178; *Carpenters & Joiners Union v. Ritter's Cafe,* 315 U. S. 722, 62 Sup. Ct. 807, 86 L. Ed. 1143. However, it cannot be made the cover for concerted action against an employer in order to achieve an unlawful or prohibited object, such as to compel an employer to coerce his employees to join a union. *Hotel & R. E. I. Alliance v. Wis. E. R. Board,* 315 U. S. 437, 62 Sup. Ct. 706, 86 L. Ed. 946, which affirmed the same case in 236 Wis. 329, 294 N. W. 632, 295 N. W. 634; *Wisconsin E. R. Board v. Milk, etc., Union* (1941), *supra; Carpenters & Joiners Union v. Ritter's Cafe, supra.*

By sec. 111.06 (1) (c), Stats. 1939, it is made an unfair labor practice for an employer individually or in concert with others to encourage or discourage membership in any labor organization, employee agency, committee, association, or representation plan by discrimination in regard to hiring, tenure, or other terms or conditions of employment.

By sec. 111.04, Stats. 1939, employees have the right of self-organization and the right to form, join, or assist labor

organizations, to bargain collectively through representatives of their own choosing, and to engage in lawful, concerted activities for the purpose of collective bargaining or other mutual aid or protection. They also have the right to refrain from any or all of such activities.

By sec. 111.07 (7), Stats. 1939, any person failing or neglecting to obey an order of the board forbidding an unfair labor practice may be subject to a court proceeding for the purpose of enforcing it.

While workers may engage in concerted action against persons with whom they have a labor dispute, if they combine a lawful and proper object with other objects which are unlawful and improper, their action is not for a proper object so long as they insist upon improper objects. Restatement, 4 Torts, p. 137, sec. 796. The Employment Relations Board found that the appellant unions had two objects: First, to coerce the employees of Sears Roebuck Company; and second, to injure the business of the employer for the purpose of coercing and inducing the employer to interfere with the rights of the complainants and its other employees to refrain from joining or assisting either of the appellant unions.

On behalf of the unions it is contended that the picketing was lawful because they had a right, in the exercise of free speech, to advertise the fact that the employees of Sears Roebuck Company were not members of a union, and that such harm as resulted to the business of Sears Roebuck Company was merely incidental harm for which the unions were not liable.

Until the decision of the United States supreme court in *Thornhill v. Alabama, supra,* the legal problems presented by picketing had been considered to present questions of tort. Historically, picketing was doubtless considered a tort, just as in the *Yellow Dog* contract cases, where the common-law rule had been that attempts to disturb the employer-employee relationship were to be regarded as tortious. When legisla-

tion such as our "Little Norris-La Guardia Act" was enacted, the question before this court, as for example in *American Furn. Co. v. I. B. of T. C. & H. of A., etc.,* 222 Wis. 338, 268 N. W. 250, and *Senn v. Tile Layers Protective Union,* 222 Wis. 383, 268 N. W. 270, 268 N. W. 872, was whether the legislature could permit picketing to the extent that they actually did permit it in that statute. The question there involved was the constitutionality of lifting portions of picketing out of the field of tort, and investing them with legal immunity. The court in the *American Furniture* and *Senn Cases, supra,* held that the legislature could constitutionally do this. It was implied by these decisions that what the legislature could do, it could undo; and the legislature proceeded, in the Employment Peace Act, to undo a great deal that was done by the earlier statute. All of this was premised on the notion that picketing is a species of conduct having certain coercive tendencies, which may be legitimate because of the interest of labor and because of the necessity for it to act in unison and to enlist public support as a counterbalance to the control of jobs in the hands of employers. Picketing was not considered to be essentially a publicizing of the facts or merits of the labor dispute, but rather the publicizing of the fact that there was a labor dispute, so that those in sympathy with the position of labor might rally to its support and put economic pressure upon the employer.

Since the decision in the *Thornhill Case, supra,* the picture has changed, because the United States supreme court there held that peaceful picketing is an exercise of the constitutional right of free speech. Where the inquiry before that time had been the competency of the legislature to authorize peaceful picketing, the question now is the competency of the legislature, in the interests of good order and public peace, to put restrictions upon this particular exercise of the right of free speech. That some limitation upon the right of free speech may legitimately be imposed by the legislature is, of

course, true. The power of the legislature to limit the right is, however, very much circumscribed. We must look to the decisions of the United States supreme court for the boundaries of the state's power.

Under the recent decisions of the United States supreme court, referred to above, picketing characterized by violence, intimidation, show of force, blocking of entrances, or even peaceful picketing in such a background, may be prohibited by the state and enjoined by the state courts; so, also, may peaceful picketing for an unlawful purpose.

As hereinbefore indicated, we hold that the evidence sustains a finding that the purpose and intent of the picketing was to put pressure upon the employer to commit an unfair labor practice and coerce its employees to join the union. This being the purpose, the picketing is unlawful; and under the decisions of this court and the United States supreme court it may be enjoined.

The activities of the unions, as outlined in the findings, far surpassed the limits of constitutional free speech. The whole setup was designed to coerce the employees, through or by the agency of the employer, and thus deprive them of the right of free choice which they had under sec. 111.04, Stats. 1939; and also to coerce the employer to interfere with the employees' right of free choice, which the employer could not do without being guilty of an unfair labor practice, under sec. 111.06 (1), (2), and (3). It was within the power of the Wisconsin Employment Relations Board to require appellant unions to cease and desist from their activities, which were clearly unlawful.

While in form paragraph (a) of the cease-and-desist order is a prohibition of peaceful picketing generally, it is to be considered in its context as a prohibition of this activity to promote the unlawful purpose found. Hence, it need not be disturbed.

*By the Court.*—Judgment affirmed.

WICKHEM, J. (*concurring*).  I agree that there is evidence, aside from the mere act of picketing, to sustain the board's finding that the purpose of the picketing and other activities was to coerce the employer to bring pressure upon his employees to join the union.  Such conduct on the part of the employer would have violated sec. 111.06 (1) (c), Stats.; and the acts of the union to so coerce the employer constituted an unfair labor practice under sec. 111.06 (3). Except for this unfair labor practice, I am of the view, (1) that peaceful picketing of the store, without the inhibited purpose, would be within the protection of the constitution under the decisions cited in the opinion; and (2) that measures to insure by peaceful means that union members do not pass picket lines are by the same cases rendered innocuous.  A determination of these points is, of course, not necessary to a decision of this case, but since the opinion appears to me to contain some language which might be argued to put in question the second point, I deem it necessary to file this concurring opinion.

Mr. Justice FRITZ concurs in the foregoing.