INTERNATIONAL UNION, UNITED AUTOMOBILE WORKERS, LOCAL No. 386, and others, Appellants, vs. WISCONSIN EMPLOYMENT RELATIONS BOARD and another, Respondents.

*January 12—February 6, 1951.*

484

For the appellants there were briefs by *Padway, Goldberg & Previant,* and oral argument by *Saul Cooper* and *David Previant,* all of Milwaukee.

For the respondent Wisconsin Employment Relations Board there was a brief by the *Attorney General, Stewart G. Honeck,* deputy attorney general, and *Malcolm Riley,* assistant attorney general, and oral argument by *Mr. Riley* and by *Mrs. Beatrice Lampert,* assistant attorney general.

For the respondent Stolper Steel Products Corporation there was a brief by *Lamfrom, Tighe, Engelhard & Peck,* attorneys, and *Leon B. Lamfrom* and *Egon W. Peck* of counsel, all of Milwaukee, and oral argument by *Mr. Peck.*

BROWN, J.   Appellants' first contention is that findings 15 and 16 of the Wisconsin Employment Relations Board have no support in the competent credible evidence.  They are:

"15. That on February 3, 1949, a meeting was had of the stewards of the local union and the president thereof, and beginning on the following Monday a substantial plant-wide slowdown of the employees of the complainant became effective, as a result of which the production turned in by the employees of the complainant was sharply curtailed, and said reduction in production extended to all work performed, including nonincentive or day work, as well as incentive work; that the plant-production records establish the fact that the plant average incentive production on incentive jobs for the

period beginning the week ending December 5, 1948, to the week ending March 13, 1949, was as follows:

| "Weeks ending | "Plant average incentive prod. on incentive jobs only |
|---|---|
| 12-5-48 | 128.0 |
| 12-12-48 | 131.3 |
| 12-19-48 | 124.5 |
| 12-26-48 | 129.5 |
| 1-2-49 | 128.8 |
| 1-9-49 | 127.5 |
| 1-16-49 | 127.5 |
| 1-23-49 | 122.4 |
| 1-30-49 | 122.7 |
| 2-6-49 | 121.7 |
| 2-13-49 | 100.3 |
| 2-20-49 | 105.6 |
| 2-27-49 | 104.0 |
| 3-6-49 | 104.7 |
| 3-13-49 | 103.8 |

"16. That the slowdown and reduction in production of the employees was carried out by them by reason of the action taken by the membership of the local union at the meeting of said union on January 20, 1949, and recommendations made in that regard by the respondents Schwenke and Weidman."

The statement of Weidman on January 11th that he was going to recommend to the union that the employees would perform only the standard hour of work, the meeting of union members on January 20th, attended and addressed by Weidman, the recommendation there by Schwenke that the employees maintain production standards and the resolution adopted immediately after "that the membership maintain standards wherever possible and exert all effort to obtain production at not less than one hundred per cent" is evidence which the board had a right to believe. Exhibits show an immediate substantial loss of production. Credibility is to be determined by the board. *Christoffel v. Wisconsin E. R. Board* (1943), 243 Wis. 332, 344, 10 N. W. (2d) 197.

The board found that a causal connection existed between the union and union leaders' activity on the one hand and the reduced production on the other. The inference is legitimate and may well be drawn. The drawing of inferences from the facts is a function of the board. *Retail Clerks' Union v. Wisconsin E. R. Board* (1942), 242 Wis. 21, 31, 6 N. W. (2d) 698, and cases there cited. The credibility of the evidence to establish those facts is for the board to determine. *Wisconsin E. R. Board v. Milk, etc., Union* (1941), 238 Wis. 379, 387, 299 N. W. 31. There is other corroborating evidence on the subject which need not be detailed. The evidence establishes the board's findings beyond the power of the court to modify or set aside, since sec. 111.07 (7), Stats., directs that if there is competent and credible evidence to support them, the findings of fact by the board shall be conclusive.

Appellants next submit that the basic contract between the corporation and the union, which was never abrogated, recognized and approved restriction of production under circumstances such as existed here, and the board's finding that the slowdown violated the contract was unfounded. Art. V, sec. 1 of the contract states:

"Except as otherwise herein provided, the direction of the working force, including the right to hire, transfer, suspend, or discharge, or discipline for proper cause, and right to relieve employees from duty because of lack of work or for other legitimate reasons, is vested exclusively in the company, provided that the company will not use such rights for the purpose of discriminating against the union or its members."

Appellants claim that these "otherwise" provisions include art. II, sec. 4 of the contract which reads:

"The company agrees that there will be no lockout of its employees and the union agrees that there will be no strike, slowdown, or stoppages of work until all peaceable means, as

enumerated within the contract, of reaching a mutually satisfactory decision on any and all problems have been tried."

They reason from this that when peaceful negotiations were not producing results satisfactory to the union and the union lost hope that matters would improve, then one of the situations which was "otherwise provided for" by art. V, sec. 1, had come into existence so that direction of the working force was no longer exclusively vested in the company but, by the contract, was then shared with the union which might then properly direct the working force to produce less than the company wished or required. While we think this is an untenable construction of the language, it is needless to labor the point because of the paramount authority of ch. 111, Stats. Appellants also contend that the adjective "unauthorized" in sec. 111.06 (2) (h), Stats., infra, applies not only to the taking of the employer's property but also to the concerted effort to interfere with production and they say that such interference was authorized by the contract and so was not an unfair labor practice by statutory definition. We do not think that the statute can fairly be read to apply the word "unauthorized" to more than the taking of property, to which, grammatically, it applies, nor, as we have said, do we think the contract authorizes the union to direct the employees in their work when the union has become dissatisfied with the progress of negotiations. Appellants also insist that the contract does not expressly prohibit slowdowns and work stoppages and so it permits them even though they are concerted efforts to interfere with production. This brings us again to a study of the statutes.

The material parts of sec. 111.06, Stats., read:

*"What are unfair labor practices.* . . . (2) It shall be an unfair labor practice for an employee individually or in concert with others: . . .

"(c) To violate the terms of a collective-bargaining agreement (including an agreement to accept an arbitration award). . . .

"(h) To take unauthorized possession of property of the employer or to engage in any concerted effort to interfere with production except by leaving the premises in an orderly manner for the purpose of going on strike. . . .

"(3) It shall be an unfair labor practice for any person to do or cause to be done on behalf of or in the interest of employers or employees, or in connection with or to influence the outcome of any controversy as to employment relations any act prohibited by subsections (1) and (2) of this section."

The preamble to the Employment Peace Act recites:

"111.01 *Declaration of policy.* The public policy of the state as to employment relations and collective bargaining, in the furtherance of which this subchapter is enacted, is declared to be as follows:

"(1) It recognizes that there are three major interests involved, namely: That of the public, the employee, and the employer. These three interests are to a considerable extent interrelated. It is the policy of the state to protect and promote each of these interests with due regard to the situation and to the rights of the others. . . .

".(4) It is the policy of the state, in order to preserve and promote the interests of the public, the employee, and the employer alike, to establish standards of fair conduct in employment relations and to provide a convenient, expeditious, and impartial tribunal by which these interests may have their respective rights and obligations adjudicated. While limiting individual and group rights of aggression and defense, the state substitutes processes of justice for the more primitive methods of trial by combat."

There is no doubt that the practices enumerated in sec. 111.06, Stats., are "individual and group rights of aggression and defense" which are forbidden to the contending parties in the interest of the third party, the public, as well as in their own and which are replaced by processes of justice, as stated in sec. 111.01 (4). The employer and the employees have no right or power by contract between themselves to reinstate these "more primitive methods of trial by combat" and to

restore to themselves and to each other rights of aggression and defense which had already been forbidden, when the contract was made, as unfair labor practices to be prevented by the Wisconsin Employment Relations Board in procedures specified by sec. 111.07. On this ground too, we must deny appellants' contention that by contract the union had acquired a right to engage in practices which the statute had prohibited.

The more difficult question posed by this appeal concerns appellants' argument that there was no interference with production within the meaning of the statute. They concede "that there was concert of effort is evidenced by the action taken at the union meeting." Their reasoning, as we understand it, is as follows:

When the incentive plan was adopted the supplemental contract set a standard of production which it treated as one hundred per cent production. Until an employee affected by the plan exceeded that standard he received pay at an agreed hourly rate, regardless of his actual accomplishment. If he made extra efforts and produced more than one hundred per cent he was paid additional compensation. If he did not feel like making the effort and dropped back to one hundred per cent he was still producing normally and satisfactorily and until he went below one hundred per cent there was no interference with production as production was defined and established by the supplemental contract. It follows, they say, that if such lesser effort was not an interference with production, so defined, there was no interference with such production if every incentive worker slowed down.

The supplemental contract was terminated by the union on October 14, 1948, and with it went not only the pay schedule but its other terms, including standards of production. Thereafter the employees worked without a contract. What the legal problem might be if, in concert, they had not put out extra effort while the contract was in force or imme-

diately upon its expiration is not before us. We have a situation where, with no contract to establish standards, or to define "normal" or "satisfactory" production the employees were voluntarily producing at a given, fairly uniform, rate. The exhibits do not show production from the middle of October, when the contract was terminated, until the first week in December. Since the employer made no complaint it may be inferred that there was no particular falling off in production. From the beginning of December to the week of the union meeting, on January 20th, incentive workers' production, without much fluctuation, averaged approximately one hundred twenty-eight per cent, measured by the former standard. Whether or not the old standard is used for convenient measurement, these workers without contract and without pressure either by the union or the employer were turning out a certain volume. From October 14th to January 20th they set their own standard. How this compares with a standard expressed in a contract which did not exist is immaterial. The legislature has not defined "production" in the Employment Peace Act. For lack of such legislative definition we can only consider production as that volume which was being freely produced before the acts or interference complained of. In the present case such former production, which had remained reasonably stable for many weeks before the acts of the union officials and the action taken at the union meeting, thereafter was uniformly reduced to about eighty per cent of such former volume. We conclude that there has been interference with production within the meaning of the statute. The board, as we have said, found the interference to be by concerted effort and attributable to the action of the local on January 20th and the recommendations of the union leaders.

The appellant unions also contend that "inasmuch as sec. 111.06 (2) (c), Stats., requires the board to determine whether or not there has been a violation of the terms of

the collective-bargaining agreement, the board is exercising in that respect a purely judicial function" and therefore the statute conferring such jurisdiction upon the board violates sec. 2, art. VII of the Wisconsin constitution and is void. Hence, they submit, the board had no jurisdiction to find that the union had committed an unfair labor practice by a breach of the collective-bargaining agreement.

The finding and conclusion of the board that the appellants were guilty of an unfair labor practice by engaging in a concerted effort to interfere with production otherwise than by striking in the manner permitted by law is sufficient to sustain the board's order even if the appellants' contention is sound, that judicial functions have been unconstitutionally delegated. However, we do not consider it is sound. Appellants say that the board is determining a question of legal right between private parties, which is a function belonging to the judiciary. This overlooks the legislative declaration, in sec. 111.01 (1), Stats., that three major interests, including the public interest, are involved and interrelated and that it is to protect the public interest as well as the private ones that the Employment Peace Act is enacted. In order to promote employment peace, collective bargaining between employer and employees is recognized and encouraged and the breach of an agreement so reached is declared an unfair labor practice. The board is created as an impartial tribunal by which the interests of the public, the employer, and the employee may be preserved and promoted. Sec. 111.01 (4). It is to promote employment peace that the entire act exists, including the act's designation of unfair labor practices and the delegation to the board of power to determine and to restrain them. The interpretation of collective-bargaining agreements by the board is wholly devoted to and limited by that purpose. In *Holland v. Cedar Grove* (1939), 230 Wis. 177, 282 N. W. 111, 282 N. W. 448, the majority of the court held that delegation of jurisdiction to the industrial

commission to determine claims between municipalities concerning poor relief was not a violation of sec. 2, art. VII of the state constitution. Mr. Justice FOWLER dissented because he believed that the industrial commission was not administering the "poor laws" but, for the purposes of the case, was acting simply as a court for the adjudication of a dispute. While he did not accept the majority view of the issue his dissenting opinion contains an authoritative expression of the principles upon which judicial powers may be exercised by administrative bodies. He said (p. 202):

"But there is a clear and distinguishing difference between the judicial power exercised by boards and commissions and that exercised by the courts. Courts proceed to hear, try, and determine all sorts of cases at law and equity that are brought before them. The administrative boards and commissions, however, are limited in their exercise of judicial power to the exercise of such as is incidental to their administration of the particular statutes the legislature has given them to administer. The public service commission can exercise such judicial power as it is necessary for it to exercise in order to enable it to administer the statutes, administration of which has been conferred upon it. So of all commissions and boards. But for them to exercise judicial power the statutes must give them a statute to administer, and their exercise of such power is limited to what is incidental and reasonably necessary to the proper and efficient administration of the statutes that are committed to them for administration."

So, here, we find a statute to be administered and a board intrusted with the administration. The interpretation of collective-bargaining agreements by the board is entirely incidental to that administration and without other purpose or effect. The delegation of judicial power to this extent meets every requirement so well expressed by Mr. Justice FOWLER. Accordingly, we hold that neither the legislature by its delegation of power to the board nor the board by exercising that power as it exercised it here has violated sec. 2, art. VII of the Wisconsin constitution.

Other issues were presented to the learned trial court which were not presented upon the appeals. We conclude that the judgments must be affirmed.

*By the Court.*—Judgments affirmed.