LAYTON SCHOOL OF ART & DESIGN, and another, Petitioners-Appellants, V. WISCONSIN EMPLOYMENT RELATIONS COMMISSION, Respondent: WISCONSIN FEDERATION OF TEACHERS, LOCAL 2149, WFT, AFT, AFL-CIO, and others, Intervenors.

No. 75-755. Argued November 29, 1977.—
Decided February 7, 1978.
(Also reported in 262 N.W.2d 218.)

326

328

330

For the appellants there were briefs by *L. C. Hammond, Jr., George K. Whyte, Jr., Ronald E. Klipsch,* and *Quarles & Brady,* with oral argument by *Mr. Hammond,* all of Milwaukee.

For respondent the cause was argued by *David C. Rice,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

For the intervenors there was a brief by *John S. Williamson, Jr.,* and *Goldberg, Previant & Uelmen, S. C.* of Milwaukee, and oral argument by *Mr. Williamson.*

ABRAHAMSON, J. Layton School of Art & Design was an employer operating an institution of higher education. Neil Lieberman was president of the school. The underlying facts giving rise to the appeal before us occurred in February, 1973, when Lieberman dismissed seven teachers for incompetence.

The union to which the discharged teachers belonged disputed the legality of the terminations. When the school and union were unable to resolve their differences, they submitted the dispute to arbitration pursuant to their collective bargaining agreement. The issue before the arbitrator was whether the discharges were for in-

competence or for another reason or reasons. The arbitrator held a hearing at which both Layton School and the union presented witnesses and documentary evidence. Lieberman testified that one of the bases upon which he determined that the teachers were incompetent was his visits to their classrooms. The arbitrator found that the discharges were not based on incompetence and ordered the teachers reinstated.

In October of 1973, the union filed a complaint with the Wisconsin Employment Relations Commission (WERC) alleging the commission of numerous unfair labor practices including an allegation that Lieberman had committed perjury in his testimony during the arbitration hearing about classroom visitations.

The WERC held hearings on the charges of unfair labor practices over three days in April of 1974. Layton School, Lieberman and their attorneys did not participate actively in the hearings because the school was about to cease operating. Lieberman did not testify before the WERC.

The WERC found that the school and Lieberman had committed various unfair labor practices, including Lieberman's commission of perjury. Lieberman sought review by the circuit court of that portion of the WERC's findings, conclusions[1] and order relating to his commis-

---

[1] The WERC's Findings include the following:

"12. That on March 2, 1973, Complainant filed a grievance regarding the aforesaid discharges; that an arbitration hearing regarding said discharges was held on June 11, 1973, June 13, 1973 and June 16, 1973 before Arbitrator Edward Krinsky; that during the hearing before said Arbitrator, Respondent Lieberman testified that his personal classroom observations of the seven faculty members discharged, during specific time periods, formed a basis for their subsequent discharge on the grounds of incompetency; that Respondent Lieberman did not make several of the specific classroom observations that he alleged took place; and that those periods he did spend in several classrooms were very brief and not of sufficient length to enable him to judge the competency of a faculty member." WERC Findings of Fact.

sion of the crime of perjury.[2] The trial court affirmed the findings, conclusions, and order of the WERC. The order of affirmance was appealed, and we affirm.

The WERC Conclusions of Law include the following:

"2. That Respondent Neil Lieberman, by knowingly making false material statements regarding classroom visitation, while under oath at the aforesaid June, 1973 discharge arbitration hearing committed perjury within the meaning of Section 946.31, Wisconsin Statutes; and that said perjury was a crime committed in connection with an employment relations controversy and thereby an unfair labor practice within the meaning of Section 111.06(1)(a) and (1) of the Wisconsin Employment Peace Act." WERC Conclusions of Law.

[2] The WERC Memorandum Accompanying Findings of Fact, Conclusions of Law and Order stated:

"Complainant alleges that Respondent Lieberman perjured himself during the arbitration hearing regarding the seven discharged faculty members and thereby violated Section 111.06(1)(l). In considering whether an unfair labor practice has been committed, it must be determined whether all the elements of perjury have been established and, if so whether said perjury was committed 'in connection with any controversy as to employment relations.'

"The elements necessary for a finding of perjury (established by Section 946.31 Wis. Stats.) are: that the statement was false and the declarant believed it to be false; that the false statement was made under a duly authorized and administered oath; that the false statement was made before an arbitrator authorized by statute to determine issues of fact; and that the false statement was material to the issue being resolved by the arbitrator.

"The record indicates that during the arbitration hearing, Respondent Lieberman testified that he had visited the classrooms of all of the subsequently discharged faculty members and that said observations formed a partial basis for the discharge. For examples, he testified that he had made multiple visits to the classroom of Complainant Nelson (See Arbitration Transcript pp. 471, 488–489) and Complainant White (See Arbitration Transcript pp. 467, 482–484). Complainants, through the testimony of numerous students and faculty members, have established that such alleged observations of Nelson and White were never made (See instant Transcript pp. 39, 98), and that the alleged observations of the other dischargees were substantially and materially more

The questions for this court are as follows:

1. Does sec. 111.06(1) (l), Stats., which makes it an unfair labor practice "to commit any crime or misdemeanor in connection with any controversy as to labor relations" authorize the WERC to determine whether conduct in violation of the criminal law has occurred or only whether the crime of which one was convicted in a judicial proceeding occurred in connection with a controversy as to employment relations?

2. Was the arbitrator "authorized by statute to determine issues of fact"? Only if he were could Lieberman's testimony constitute perjury within the meaning of sec. 946.31(1) (d), Stats.

3. Does the statute enabling the WERC to determine whether conduct violates the criminal law constitute an unconstitutional delegation of the judicial function and a violation of due process of law?

---

brief than Respondent Lieberman's testimony states. With no evidence to controvert Complainant's testimony, it must be concluded that Respondent Lieberman's testimony was false and known by him to be false. It is undisputed that the statements were made under oath before an arbitrator statutorily authorized to determine issues of fact. Given that the issue before the Arbitrator was whether the discharges were for 'cause' and that Respondent Lieberman's testimony was aimed at establishing 'cause', it must also be concluded that the false statements were material to the issue being resolved. Thus, all the requisite elements of perjury are present.

"It must now be determined whether the perjury was committed in connection with an employment relations controversy. The fact that the perjury occurred during a grievance arbitration hearing is enough to satisfy this requirement. Such proceedings are at the terminal end of disputes over the administration of collective bargaining agreements, and such contract administration is essential to employment relations. Therefore, a finding that Respondent Lieberman violated Section 111.06(1)(l) and (a) is warranted." WERC Memorandum accompanying Findings of Fact, Conclusions of Law and Order.

## I.

The challenged statutory section provides that "it shall be an unfair labor practice for an employer . . . to commit any crime or misdemeanor in connection with any controversy as to employment relations." Sec. 111.-06(1)(l), Stats.[3] Lieberman argues that one cannot be said to have "committed" a crime unless one is convicted of the crime and that therefore the statute authorizes the WERC to determine only (1) whether a party to a labor dispute has been convicted of a crime by a court of competent jurisdiction; and (2) whether the crime of which the party was convicted occurred in the context of an employment relations dispute. Although Lieberman's interpretation is plausible, we do not believe it is correct.[4] Neither in the context of sec. 111.06(1)(l) nor in the broader context of the criminal code have the words "commission" and "conviction" been read as synonymous.

Crime is defined in sec. 939.12, Stats., as "conduct which is prohibited by state law and punishable by fine or imprisonment or both."[5] One commits a crime, there-

---

[3] There is a parallel provision providing that "it shall be an unfair labor practice for an employe . . . to commit any crime or misdemeanor in connection with any controversy as to employment relations." Sec. 111.06(2)(j), Stats.

[4] There is very limited legislative history to assist us in determining the legislative intent. Professor Justin Smith commented that the unfair labor practices provisions (sec. 111.06, Stats.) were developed by a private attorney, no record was kept of the debate in the legislature on the measure, and no legislative history is available for critical study. Smith, *Unfair Labor Practices in Wisconsin*, 45 Marq. L. Rev. 223 (1961).

[5] The word "crime" was defined by the legislature in 1955. Ch. 696, Laws of 1955. In 1939 when sec. 111.06, Stats., was enacted there was no statutory definition of the word "crime." It would appear that the language "crime and misdemeanor" in sec. 111.06(1)(l), as enacted, meant felony and misdemeanor.

fore, by engaging in conduct which is potentially punishable by fine or imprisonment. Only upon conviction can that potentiality be realized. Section 939.73, Stats., provides that "[a] penalty for the *commission* of a crime may be imposed only after the actor has been duly *convicted* in a court of competent jurisdiction." [Emphasis added.] Because "commission" and "conviction" are not synonymous, sec. 111.06(1)(l) need not be construed to require that a conviction be established before the WERC can determine that an employer has committed an unfair labor practice.

We believe that by using the words "to commit any crime or misdemeanor," the legislature incorporated by reference statutory descriptions of conduct which constitute unfair labor practices if committed in the course of a labor relations controversy. The effect of a statutory reference is the same as if the terms of the incorporated statutes had been explicitly written into sec. 111.-06, Stats.[6] By using this technique, the legislature avoided the lengthy task of restating the elements of conduct which it wished to label an unfair labor practice when it occurred in the context of employment relations.[7]

---

It should also be noted that in setting out the state's jurisdiction over crime, the Criminal Code uses the term "crime" to refer to conduct before it has been evaluated by the legal system:

"a person is subject to prosecution and punishment under the law of this state if (a) he commits a crime, any of the constituent elements of which takes place in this state. . . ." Sec. 939.03, Stats.

*See* Williams, *The Definition of Crime,* 8 Current Legal Problems 107, 123 (1955).

[6] *Engel v. Davenport,* 271 U.S. 33, 38 (1926). *See* Read, *Is Referential Legislation Worth While?* 25 Minn. L. Rev. 261, 269 (1941); Dickerson, *Legislative Drafting* 96–99 (1954); Sentell, *"Reference Statutes"—Borrow Now and Pay Later?* 10 Ga. L. Rev. 153 (1975).

[7] "Greatest advantage gained by incorporating terms by reference is that the new bill may be shortened with two practical

Thus with the use of six words it incorporated a multitude of descriptions of undesirable conduct.[8] Changes in the criminal code are automatically incorporated as they occur.[9] The elements specified in a criminal statute are significant in this context only as requisites of an unfair labor practice. Their source "contributes nothing to their force in the field to which they are translated. In that field their strength and operation come altogether from their inclusion in the [new] law." *Panama R. R. Co. v. Johnson,* 264 U.S. 375, 389 (1924). Thus, in the case at bar, sec. 111.06(1)(l) should be read as if the legislature had said the following:

It shall be an unfair labor practice for an employer—individually or in concert with others and in connection with any controversy as to employment relations—orally to make under oath or affirmation a false material statement which he does not believe to be true in any matter, cause or action or proceeding before an arbitrator authorized by statute to determine issues of fact.

This interpretation of the phrase "to commit any crime or misdemeanor" is consistent with the interpretation that phrase has been given by the WERC, as well as by

---

benefits, reduction in the volume of the statute books, and application of established precepts of proven worth to a new situation with a minimum of legislative tinkering." Read, *supra* note 6, at 295.

[8] *E.g.,* resisting or obstructing an officer (sec. 946.41, Stats.), creating bomb scares (sec. 947.015, Stats.), threatening to communicate derogatory information (sec. 943.31, Stats.), committing forgery (sec. 943.38, Stats.), etc.

[9] When a statute refers to a general body of law, rather than to another specific statute section, "the reference is construed to mean that the law is as it reads thereafter at any given time including amendments subsequent to the time of adoption." *George Williams College v. Williams Bay,* 242 Wis. 311, 316, 7 N.W.2d 891 (1943); *accord Union Cemetery v. Milwaukee,* 13 Wis.2d 64, 68, 108 N.W.2d 180 (1961); *see* 2A Sands, Sutherland Statutory Construction, sec. 51.08, p. 324 (4th ed. 1973); Note, *Legislation—By Reference—Effect of Amending the Adopted Statute,* 1950 Wis. L. Rev. 726.

labor and management,[10] since sec. 111.06(1) (l) was enacted. The WERC has on numerous occasions determined that a party who has not been convicted of a crime has nonetheless committed a "crime or misdemeanor in connection with [a] controversy as to employment relations" and therefore has committed an unfair labor practice.[11]

---

[10] Professor Smith's report of his two-year field study of the Peace Act notes that employers and unions also interpreted the provision in question as not requiring a conviction by a court. Smith, *supra* note 4, at 238, 239, 255, 363.

[11] See, e.g., *Creamery Package Mfg. Co.*, WERB Dec. No. 117 (1940) holding that the union committed an unfair labor practice "by committing misdemeanors in physically blocking the entrance to the Complainant's premises."

In numerous cases, the WERC has determined that an employer committed an unfair labor practice by violating sec. 103.43 (1), Stats., which makes it a misdemeanor to advertise in a newspaper for new employees without mentioning in the ad that a strike against the employer is in progress. See e.g., *North Shore Publishing Co.*, WERC Dec. No. 11310-B, C (1973); *Streckert Manufacturing Co., Inc.*, WERC Dec. No. 8777-A, B (1969); *Fall River Foundry*, WERB Dec. No. 8103 (1967); *Infant Socks, Inc.*, WERB Dec. No. 7879 (1967); *Flambeau Plastics Corp.*, WERB Dec. No. 7727 (1966); *Chuck Wagon Industrial Catering Service*, WERB Dec. No. 7093-B (1966), aff'd Milwaukee County Circuit Court, Case No. 342-910 (2/13/68); *Milwaukee Cheese Co.*, WERB Dec. No. 5792 (1961); and *National Pressure Cooker Co.*, WERB Dec. No. 3686 (1954).

The WERC has found that employees, union representatives, and employers committed unfair labor practices by committing assault and battery or other types of physical aggression constituting crimes or misdemeanors. See *My's Restaurant Inc.*, WERC Dec. No. 8822-B (1969); *Milwaukee Nash*, WERB Dec. No. 3275 (1952); *Marathon Electric Manufacturing Corp.*, WERB Dec. No. 3141 (1952); *Creamery Package Mfg. Co.*, *supra*.

The WERB has found that an employer commits an unfair labor practice if he violates sec. 103.86, Stats., which makes it a misdemeanor for an employer to fail to make welfare or pension fund payments required under the collective bargaining agreement. See *Gotzion Ceramic Tile Co.*, WERC Dec. No. 10832-A, B (1973); *Lake City Tile*, WERC Dec. No. 10831-A, B (1973); *Wonderland Foods, Inc.*, WERC Dec. No. 10256-A, B (1971); and *Lorentzen Tile Co.*, WERC Dec. No. 9630 (1970).

The WERC's interpretation of the statute is contemporaneous with the enactment of the statute and has been consistent over time.[12] Long-standing administrative construction of a statute is accorded great weight in the determination of legislative intent because the legislature is presumed to have acquiesced in that construction if it has not amended the statute.[13]

Although there is no analogous provision to sec. 111.06(1)(1) in the National Labor Relations Act, the issue of the effect of criminal conduct in a labor dispute has been raised. In *Southern Steamship Co. v. N.L.R.B.*, 316 U.S. 31 (1942), the employer challenged the Board's order to reinstate a group of seamen who had been discharged following a strike. The Supreme Court held that the Board had abused its discretion in ordering reinstatement since the Board failed to recognize or take into consideration that the striking employees had committed the crime of mutiny. The Supreme Court did not find it inappropriate for an agency to determine the occurrence of criminal activity when the determination was incidental to enforcement of the Act which the agency administered.

In several cases, the N.L.R.B. has found that employee discharges were justified because the employee had engaged in behavior which could be characterized as a crime or misdemeanor. We recognize that, although these board orders have been upheld on court review, the appropriateness of the board making such determinations has not been explicitly raised in any of these cases. See *J. P. Stevens & Co. v. N.L.R.B.*, 449 F.2d 595 (4th Cir. 1971), 181 N.L.R.B. No. 97 (1970) (assault); *A.H.I. Machine Tool & Die, Inc. v. N.L.R.B.*, 432 F.2d 190 (6th Cir. 1970), 176 N.L.R.B. No. 57 (1969) (assault); *Nix v. N.L.R.B.*, 418 F.2d 1001 (5th Cir. 1969), 172 N.L.R.B. No. 239 (1968) (theft).

[12] The contemporaneous construction and official interpretation given a statute by those responsible for its administration may be used in ascertaining legislative intent. *Wauwatosa v. Milwaukee County*, 22 Wis.2d 184, 189, 125 N.W.2d 386 (1963); 2A Sands, Sutherland Statutory Construction, secs. 49.03, 49.04 (4th ed. 1973).

[13] *Sands, supra* note 12, at sec. 49.10; *Milwaukee Fire Fighters Asso. v. Milwaukee*, 50 Wis.2d 9, 19, 183 N.W.2d 18 (1971); *State*

We believe this interpretation of the statute is consistent with its purpose. The legislature intended to provide a convenient and expeditious tribunal to adjudicate the rights and obligations of parties to a labor dispute. Sec. 111.01(4), Stats. We do not believe the legislature intended the WERC to be dependent on criminal law enforcement agencies in the exercise of its powers. Expeditious resolution of labor disputes might require the WERC to act before a criminal conviction could be obtained,[14] or to act notwithstanding the fact that the district attorney has exercised his discretion not to press criminal charges and impose criminal penalties on admittedly criminal conduct.[15] Sec. 111.06 is not a substitute for any of the substantive or procedural provisions relating to a criminal proceeding.[16] It is an independent proceeding. The WERC's ability to determine conduct which constitutes an unfair labor practice (and which is also subject to criminal prosecution) is incidental and reasonably necessary to furthering state labor policy.

ex rel. Boulton v. Zimmerman, 25 Wis.2d 457, 462, 130 N.W.2d 753 (1964). But cf. Green Bay Packaging, Inc. v. ILHR Dept., 72 Wis.2d 26, 33, 240 N.W.2d 422 (1976).

[14] Assistant Attorney General Beatrice Lampert noted that the crime/misdemeanor unfair labor practices provision "would probably be primarily useful to provide an immediate summary remedy rather than to await the process of the criminal law. Its validity has not been tested." Lampert, The Wisconsin Employment Peace Act, 1946 Wis. L. Rev. 193, 202.

[15] For a discussion of the discretion of the district attorney, see sec. 968.02, Stats.; State ex rel. White v. Gray, 57 Wis.2d 17, 29, 203 N.W.2d 638 (1973); Mallon v. State, 49 Wis.2d 185, 189, 181 N.W.2d 364 (1970); Brown, The Wisconsin District Attorney and the Criminal Case 37, 38 (1971); Cole, The Decision to Prosecute, in Rough Justice 123 (J. Robertson ed. 1974).

[16] Sec. 111.07(1), Stats. authorizes the WERC to hear controversies concerning unfair labor practices but adds ". . . nothing herein shall prevent the pursuit of legal or equitable relief in courts of competent jurisdiction."

For the reasons set forth above, we conclude the legislature intended the WERC to be able to determine whether particular conduct (which is described in the statutes as a crime) has occurred in connection with an employment relations controversy. The legislature did not intend the WERC merely to determine whether an adjudication of criminal guilt has been made by a court.

## II.

Sec. 946.31, Stats., describes the crime of perjury as follows:

"(1) Whoever under oath or affirmation orally makes a false material statement which he does not believe to be true, in any matter, cause, action or proceeding, before any of the following, whether de jure or de facto, . . .

". . .

"(d) An administrative agency or arbitrator authorized by statute to determine issues of fact . . . ." Sec. 946.31 (1) (d), Stats.[17]

The question before this court is whether the arbitrator in the instant case was an "arbitrator authorized by statute to determine issues of fact."[18]

---

[17] At common law perjury was limited to judicial proceedings. Modern criminal statutes have broadened the proceedings in which perjury may be committed. Clark & Marshall, *Crimes* 1039 (7th ed. 1967); Burdick, *Law of Crime*, sec. 328 (1946); Comment, *Perjury: The Forgotten Offense*, 65 J. Cr. L. & Crimin. 361 (1974).

[18] The parties agree that the issue is whether the arbitrator is authorized to act under a statute or whether the arbitrator is authorized to act under the agreement. The parties are not con-

For purposes of this appeal, Lieberman does not take issue with the WERC's findings that his statements before the arbitrator were false, material statements which he did not believe to be true. Rather, Lieberman contends that he could not have committed perjury, as perjury is defined in sec. 946.31(1)(d), because the arbitrator before whom he testified was not, within the contemplation of that section, an arbitrator authorized *by statute* to determine issues of fact. The arbitrator's power to act, argues Lieberman, stemmed from, and only from, the collective bargaining agreement between the school and the union.[19]

tending that there must be a statute specifically authorizing the arbitrator to make findings of fact or to state findings of fact separately.

The arbitrator's function is to decide the dispute submitted. Inherent in that function is the power to determine the facts and apply legal principles. The arbitrators are judges of both law and fact. Kellor, *Arbitration in Action* 7, 105 (1941).

Ordinarily in commercial arbitration the arbitrator does not explain the award; in labor arbitration an award is usually accompanied by an opinion which sets forth the arbitrator's findings of facts and rationale. Elkouri & Elkouri, *How Arbitration Works*, 236–239 (3d ed. 1973).

Chapter 298 does not specifically state that the arbitrator shall make findings of fact. Compare sec. 111.57(2), Stats. Nor does chapter 298 describe the contents of the award. Indeed, the state statutes relating to arbitration tend to be very general in nature, and Wisconsin is no exception. Chapter 298 is primarily concerned with the enforceability of an agreement to arbitrate and then with the review and enforcement of the award. The manner of conducting the arbitration proceeding after the arbitrator is selected and until the award is issued is left largely within the control of the parties and the arbitrator. Elkouri & Elkouri, *Legal Status of Arbitration*, ch. 2 (3d ed. 1973).

[19] Lieberman also contends that only arbitrators appointed for compulsory arbitrations are authorized by statute within the meaning of sec. 946.31(1)(d), Stats. He cites as examples of statutes which require compulsory, involuntary arbitration those

The trial court determined, and we agree, that the arbitrator in this case was "authorized by statute" within the meaning of sec. 946.31(1) (d).

It is true, as Lieberman contends, that the arbitrator was selected pursuant to the collective bargaining agreement between the union and the school which provided for arbitration as a third stage in the grievance procedure. The agreement provided that:

". . . [t]he grievant may appeal to an arbitrator selected by the parties from a panel furnished by the Wisconsin Employment Relations Commission. Each party shall strike members of the panel alternately until one remains who shall be the arbitrator. The arbitrator shall hold a hearing within thirty (30) days of his appointment. The decision of the arbitrator shall be issued within thirty (30) days from the date of the closing of the hearing. The decision of the arbitrator shall be final and binding on both parties. The cost of the arbitration shall be shared equally by both parties."[20]

Pursuant to this clause of the agreement, in May, 1973, the WERC submitted to the school and union a list of five arbitrators from which the parties were to "make their selection for an arbitrator to hear and decide the matters in dispute." On May 18, 1973, the school and

covering the employees of public utilities (sec. 111.50, Stats.) and municipalities (sec. 111.70, Stats.).

We do not accept Lieberman's construction limiting the perjury statute to cover only compulsory arbitration. It appears that sec. 111.50 does not exclude voluntary arbitration or other methods of dispute settlement. *Madison Bus Co.*, WERB Dec. No. 2012 (1949). Section 111.70 relating to employees of municipalities was enacted after the current perjury statute and thus could not represent the statutory authorization of arbitration contemplated by the legislature when it drafted sec. 946.31(1) (d), Stats.

[20] For a similar provision in a collective bargaining agreement and for a discussion of collective bargaining agreements under sec. 111.10 and ch. 298, *see Jt. School Dist. No. 10 v. Jefferson Ed. Assn.*, 78 Wis.2d 94, 99, n. 3, 113–116, 253 N.W.2d 536 (1977).

union advised Edward B. Krinsky that they had selected him as arbitrator pursuant to the foregoing provisions of the collective bargaining agreement.

The issue becomes whether the WERC participation in the selection of the arbitrator converts this arbitration to one covered by the statutes rather than merely one agreed to by the parties. Lieberman contends that the WERC's supplying a list of names from which the school and the union selected the arbitrator did not convert the arbitration into one "authorized by statute." The action of the WERC in supplying the list may have been authorized by statute, he argues, but the arbitration which followed was not.

The Wisconsin Arbitration Act, ch. 298, Stats., was enacted in 1931 and was intended to make arbitration agreements subject to the statute specifically enforceable. Arbitration regulated by chapter 298 has been referred to by this court as statutory arbitration and arbitration not subject to the provisions of chapter 298 as common law arbitration.[21]

Chapter 298, Stats., is inapplicable to collective bargaining agreements between employers and associations of employees except as provided in sec. 111.10, Stats.[22]

[21] *Madison v. Frank Lloyd Wright Foundation*, 20 Wis.2d 361, 382–385, 122 N.W.2d 409 (1963).

[22] Chapter 298 was originally an exclusively commercial arbitration statute. In 1939 sec. 298.01 was amended, when the Employment Peace Act was passed, to include the provision referring to sec. 111.10, Stats. Laws of 1939, ch. 57, sec. 3.

Sec. 111.10, Stats. provides as follows:

"Parties to a labor dispute may agree in writing to have the commission act or name arbitrators in all or any part of such dispute, and thereupon the commission shall have the power so to act. The commission shall appoint as arbitrators only competent, impartial and disinterested persons. Proceedings in any such arbitration shall be as provided in ch. 298."

Sec. 111.10, Stats. provides that "[p]arties to a labor dispute may agree in writing to have the [WERC] act or name arbitrators in all or any part of such dispute, and thereupon the [WERC] shall have the power so to act. . . . Proceedings in any such arbitration shall be as provided in ch. 298."

Sec. 111.10, Stats. is broadly written. It merely states that parties to a labor dispute may agree in writing to have the WERC name arbitrators. Thereupon the WERC shall have the power to so act, and the arbitration proceedings shall be as provided in chapter 298. The parties obviously contemplated WERC participation in the arbitrator's selection. We believe that the WERC's power to participate in grievance arbitration as a dispute settlement method should be liberally construed, because "the very purpose of grievance arbitration is to prevent individual problems from blossoming into labor disputes which cause strikes and lockouts and which require collective bargaining to restore peace and tranquility." *Local 1226 v. Rhinelander*, 35 Wis.2d 209, 216, 151 N.W.2d 30 (1967).

We conclude that the WERC's statutory authority to appoint arbitrators under sec. 111.10, Stats. includes not only the direct appointment of an arbitrator but also the naming of persons to a panel, one or more of whom shall be selected by the parties as arbitrator.[23] We hold that the arbitration undertaken in this case falls within

---

[23] In the compulsory employment relations statutes covering public utilities and municipal employees, the provision for selecting arbitrators is the same as that provided in the collective bargaining agreement in the instant case. Three or five names are provided by the WERC, and the parties choose one by striking names. Secs. 111.55 and 111.77(3), Stats. However, these statutory provisions explicitly state that the person selected by the parties shall be appointed as arbitrator by the WERC.

sec. 111.10, Stats., and that chapter 298 applies. The arbitration involved in this case was statutory, not common law, arbitration, and the arbitrator was therefore "authorized by statute" to determine facts.

## III.

Lieberman next argues that the statute which empowers the WERC to determine that a crime or misdemeanor has been committed violates the principle of separation of powers and constitutes a denial of due process.

The first point to note is that the legislature has not conferred upon the WERC the power to adjudicate criminality. Section 111.06(1)(1) authorizes the WERC to determine whether an employer has engaged in conduct described in a criminal statute. The statute does not authorize the WERC to "convict" the employer; it does not authorize the WERC to punish the employer by imposing a fine or imprisonment. The WERC is empowered to make a finding that certain acts, described in a "criminal statute," were committed in an employment controversy; it is thus limited in imposing its sanctions to those instances of misconduct which occur in labor relations over which the WERC has jurisdiction.

Sec. 2, art. VII of the Wisconsin Constitution vests the judicial power of the state in the courts.[24]

The doctrine of separation of powers is a fundamental principle of American constitutional government. However, it is neither possible nor practicable to categorize all governmental action as exclusively legislative, executive or judicial.[25] "If the doctrine of the separation of

---

[24] "The judicial power of this state, both as to matters of law and equity, shall be vested in a supreme court, circuit courts and courts of probate . . . ."

[25] *The Federalist* No. 47 (Madison); 1 Davis, *Administrative Law* sec. 1.09, at p. 68 (1958); 1 Cooper, *State Administrative*

powers were a doctrinaire concept to be made use of with pedantic vigor, the use of the modern administrative agency would have been an impossibility in our law." Schwartz, *The Supreme Court* 102 (1957).

The doctrine of separation of powers should be viewed as a general principle to be applied to maintain the balance between the three branches of government, preserve their respective independence and integrity, and prevent concentration of unchecked power in the hands of any one branch.

This court has recognized that not all adjudication is judicial and that courts are not the exclusive instrumentalities for adjudication. In several cases we have upheld the scope of a given delegation of adjudicative authority to an administrative agency on the ground that the power delegated is only *quasi judicial,* since it is simply incidental to the agency's duty of administering the law.[26]

---

*Law* 16 (1965); *Waukegan v. Pollution Control Board,* 57 Ill.2d 170, 311 N.E.2d 146 (1974); Brown, *Administrative Commissions & The Judicial Power,* 19 Minn. L. Rev. 261, 265 (1935).

[26] We upheld the worker's compensation statutes authorizing an administrative agency to decide controversies concerning work related injuries and diseases saying:

". . . We do not consider the Industrial Commission a court, nor do we construe the act as vesting in the Commission judicial powers within the meaning of the constitution. *It is an administrative body or arm of the government which in the course of its administration of a law is empowered to ascertain some questions of fact and apply the existing law thereto, and in so doing acts quasi-judicially but it is not thereby vested with judicial power in the constitutional sense.*

"There are many such administrative bodies or commissions, and with the increasing complexity of modern government they seem likely to increase rather than diminish. Examples may be easily thought of,—town boards, boards of health, boards of review, boards of equalization, railroad rate commissions, and public utility commissions all come within this class. They per-

In *International Union v. WERB*, 258 Wis. 481, 46 N.W.2d 185 (1951), the union, relying on sec. 2, art. VII of the Wisconsin Constitution, challenged the power of the Wisconsin Employment Relations Board to determine whether there was a violation of the collective bargaining agreement which constituted an unfair labor practice. This court upheld the statute against the attack of unlawful delegation:

". . . In order to promote employment peace, collective bargaining between employer and employees is recognized and encouraged and the breach of an agreement so reached is declared an unfair labor practice. The board is created as an impartial tribunal by which the interests of the public, the employer, and the employee may be preserved and promoted. Sec. 111.01(4). It is to promote employment peace that the entire act exists, including the act's designation of unfair labor practices and the delegation to the board of power to determine and to restrain them. . . .

"[The following excerpt from Justice Fowler's dissenting opinion in *Holland v. Cedar Grove*, 230 Wis. 177, 202, 282 N.W. 111 (1939) is] an authoritative expression of the principles upon which judicial powers may be exercised by administrative bodies. . . .

" 'But there is a clear and distinguishing difference between the judicial power exercised by boards and com-

form very important duties in our scheme of government, but they are not legislatures or courts. . . . While acting within the scope of its duty, or its jurisdiction, as it is sometimes called, such a board may lawfully be endowed with very broad powers, and its conclusions may be given great dignity and force, so that courts may not reverse them unless the proof be clear and satisfactory that they are wrong. . . ." (Emphasis added.) *Borgnis v. Falk Co.*, 147 Wis. 327, 358, 359, 133 N.W. 209 (1911).

*See also:* ". . . [S]ome duties involving inquiries *judicial* in their nature may be delegated to administrative officers where the acts of such officers are later subject to judicial review." *Family Finance Corp. v. Sniadach*, 37 Wis.2d 163, 176, 154 N.W.2d 259 (1967), *reversed on other grounds*, 395 U.S. 337 (1969) (Emphasis added.).

missions and that exercised by the courts. Courts proceed to hear, try, and determine all sorts of cases at law and equity that are brought before them. The administrative boards and commissions, however, are limited in their exercise of judicial power to the exercise of such as is incidental to their administration of the particular statutes the legislature has given them to administer. The public service commission can exercise such judicial power as it is necessary for it to exercise in order to enable it to administer the statutes, administration of which has been conferred upon it. So of all commissions and boards. But for them to exercise judicial power the statutes must give them a statute to administer, and their exercise of such power is limited to what is incidental and reasonably necessary to the proper and efficient administration of the statutes that are committed to them for administration.' " *Id.* at 493, 494.

The requirements of *International Union* are satisfied here. The WERC is an administrative board created by the legislature to administer certain statutes. Its "judicial power," *i.e.*, its power to determine whether certain conduct constitutes an unfair labor practice, is "incidental and reasonably necessary" to the administration of the statute. The delegation of "judicial power" to this extent has been upheld by this court.[27]

For these reasons we hold that sec. 111.06(1)(l) does not constitute an unconstitutional delegation of judicial power and does not violate sec. 2, art. VII of the Wisconsin Constitution.

Lieberman claims that by "branding him a criminal perjurer" without according him the protections due a criminal accused under the United States and the Wisconsin constitutions, the WERC denied him his right to due process of law. In Lieberman's view, a proceeding under sec. 111.06(1)(l), although ostensibly civil,

---

[27] *Cf. Southern Steamship Co. v. N.L.R.B.*, 316 U.S. 31 (1942), discussed at note 11 *supra.*

is in reality penal. "Civil labels and good intentions do not themselves obviate the need for criminal due process safeguards," argues Lieberman.

The question whether the WERC proceeding was in fact essentially penal, and thus whether Lieberman should have been accorded the due process protections due a criminal accused, cannot be brushed aside merely because the administrative proceeding is denominated "civil." We are not bound by the label the legislature puts on a proceeding.[28] The United States Supreme Court in *In re Gault*, 387 U.S. 1 (1967), and *In re Winship*, 397 U.S. 358 (1970), has clearly warned that a legislature cannot abridge constitutional rights by labeling as civil what is in impact criminal. Because it is theoretically possible to import the substance and sanctions of the criminal law into a purportedly civil procedure, we must inquire into the essential character of the proceedings in issue before we can determine whether the constitutional protections granted in criminal proceedings should have been granted in the case at bar. We have already determined that the legislature has not conferred upon the WERC the power to adjudicate criminal guilt. Lieberman contends that a proceeding under sec. 111.06(1)(l) must nonetheless be regarded as criminal because of the severity of the sanctions the WERC is empowered to impose and because a determination that an employer has committed

[28] "How simple would be the tasks, of constitutional adjudication and of law generally if specific problems could be solved by inspection of the labels pasted on them!" *Trop v. Dulles*, 356 U.S. 86, 94 (1958).

*See Lipke v. Lederer*, 259 U.S. 557 (1922), where the court found that a "civil money penalty" imposed on criminal conduct was in reality a criminal proceeding requiring a criminal jury trial. *Cf. United States v. LaFranca*, 282 U.S. 568 (1931).

"civil perjury" is akin to an adjudication of criminal culpability.

We turn first to Lieberman's claim that because of their severity, the sanctions imposed in a WERC proceeding must be viewed as essentially criminal. Lieberman points out that a determination that an employer has committed perjury triggers the WERC's power to regulate the employer's future behavior and to suspend rights to which he would otherwise have been entitled under state law. This consequence stems from the fact that a finding that an employer has committed an unfair labor practice empowers the WERC to issue cease and desist orders; to suspend the rights, immunities, privileges, or remedies afforded by The Employment Peace Act; to award money damages; and to require affirmative action, such as the reinstatement of employees.[29]

No precise definition distinguishes a civil from a criminal sanction. In general it has been said that if the purpose of a sanction is primarily regulatory or remedial, the underlying proceeding is essentially civil, and that if the purpose of a sanction is primarily punitive or deterrent, the underlying proceeding is essentially criminal. The WERC regularly issues cease and

---

[29] Sec. 111.07(4), Stats. provides that the Commission "may require the person complained of to cease and desist from the unfair labor practices found to have been committed, suspend his rights, immunities, privileges or remedies granted or afforded by this subchapter [Employment Peace Act] for not more than one year, and require him to take such affirmative action, including reinstatement of employes with or without pay, as the commission deems proper. Any order may further require such person to make reports from time to time showing the extent to which he has complied with the order."

In this case Lieberman was ordered to cease and desist from further specified acts found to be unfair labor practices.

desist orders, reinstates employees, and grants back wages. These sanctions, designed to make whole those damaged by improper actions, as well as to prevent any further damage, have been traditionally recognized as remedial. A monetary assessment in the nature of a fine might be construed as penal; however, the monetary sum the WERC is empowered to award is designed to make the parties whole. No monetary damages were imposed in this case.[30] The WERC has the power to suspend the rights, immunities, privileges, or remedies afforded by The Employment Peace Act. Conceivably, this sanction could be imposed with a primary view toward punishment and deterrence; this sanction was not, however, imposed in this case, and neither party has explored its significance. We are unwilling to say that the sanctions in the case at bar are of such severity that Lieberman must be accorded the full panoply of constitutional protections required in a criminal proceeding.

We turn now to Lieberman's contention that the WERC's determination that he had committed perjury was in fact an adjudication of criminal guilt. We have already determined that the legislature has not con-

---

[30] For a discussion of penalties imposed by administrative agencies taking on the character of criminal proceedings, see Note, *The Imposition of Administrative Penalties & the Right to Trial by Jury—An Unheralded Expansion of Criminal Law?*, 65 J. of Cr. L. & Criminology 345 (1974).

The United States Supreme Court has recognized that an individual can suffer deprivation as serious as imprisonment without being incarcerated, and has treated loss of citizenship as a criminal sanction. *Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963).

See Comment, *The Concept of Punitive Legislation & The Sixth Amendment: A New Look at Kennedy v. Mendoza-Martinez*, 32 U. of Chi. L. Rev. 290 (1965).

ferred upon the WERC the power to adjudicate criminal guilt. Indeed, sec. 111.06(1)(l) is only one of numerous instances in which conduct described in a criminal statute is also made the subject of administrative or civil judicial proceedings.[31] We recognize that an adminis-

[31] Courts determine for purposes of the civil case before them whether a criminal statute has been violated. *Consider, e.g.,* contracts held void because they are illegal; violation of a criminal statute constituting negligence per se; adultery as a ground for divorce. *See e.g., Molloy v. Molloy,* 46 Wis.2d 682, 176 N.W.2d 292 (1970); *Green v. Jones,* 23 Wis.2d 551, 128 N.W.2d 1 (1964); *Kuhl Motor Co. v. Ford Motor Co.,* 270 Wis. 488, 71 N.W.2d 420 (1955); *Bruce's Juices v. American Can Co.,* 330 U.S. 743 (1947); *Continental Wall Paper Co. v. Voight,* 212 U.S. 227 (1909); *McMullen v. Hoffman,* 174 U.S. 639, 669–70 (1899).

*See also* sec. 66.051, Stats., providing that cities and villages are not precluded from prohibiting conduct which is the same or similar to that prohibited by chs. 941 to 947 (the Criminal Code).

In *Helvering v. Mitchell,* 303 U.S. 391 (1938), the United States Supreme Court upheld a "civil administrative sanction," namely an additional tax assessment where there was fraudulent tax deficiencies with intent to evade taxes. Justice Brandeis, writing for the Court, held that the civil burden of proof obtained, that prior acquittal in a criminal proceeding for the same violation under a different part of the code raised no *res judicata* defense, and that "the determination of the facts upon which liability is based may be by an administrative agency instead of a jury . . . ."

In *Cobin v. Pollution Control Board,* 16 Ill. App.3d 958, 307 N.E.2d 191 (1974), the court upheld administrative agency sanctions for violation of a statute, the violation of which was also a misdemeanor. *See* Polelle, *The Illinois Environmental Protection Act: Constitutional Twilight Zone of Criminal and Civil Law,* 61 Ill. B. J. 584 (1973).

"In the present state of the law, confusion will probably be avoided if conduct which is to be subject to administrative penalties is not also denounced as criminal and subject to the sanctions of the criminal law, but no really persuasive reason argues against legislative prescription of a whole arsenal of sanctions, to be used cumulatively or alternatively as the case may be; many decided cases, such as those involving income tax fraud, show that an act otherwise criminal may also be subjected to an

trative body which does not adjudicate in the sense that a criminal court does, can nevertheless exercise "a function very much akin to making an official adjudication of criminal culpability," *Jenkins v. McKeithen,* 395 U.S. 411, 427 (1969), and that under such circumstances "the rigorous protections relevant to criminal prosecutions might well be the controlling starting point for assessing" the protections which must be accorded those who appear before it. *Hannah v. Larche,* 363 U.S. 420, 488 (1960) (Frankfurter, J., concurring opinion).

Lieberman calls our attention to *Jenkins v. McKeithen,* 395 U.S. 411 (1969), and appears to argue that the description given the function of Louisiana's Labor-Management Commission of Inquiry by the United States Supreme Court in *Jenkins* constitutes an apt description of the essential function of a proceeding under sec. 111.06(1)(l), Stats. Louisiana's Labor-Management Commission of Inquiry was created to investigate violations or possible violations of state and federal criminal laws arising out of matters in the field of labor-management relations. In *Jenkins* the Court described the functions of the Commission of Inquiry as follows:

"It is true . . . that the Commission does not adjudicate in the sense that a court does, nor does the Commission conduct, strictly speaking, a criminal proceeding. Nevertheless, the Act, where analyzed in light of the allegations of the complaint, makes it clear that the Commission exercises a function very much akin to making an official adjudication of criminal culpability. . . .

"The Commission is limited to criminal law violations; the Act explicitly provides that the Commission shall have no jurisdiction over civil matters in the labor-management relations field. . . . [E]verything in the Act points to the fact that it is concerned only with expos-

administrative penalty . . . ." Gellhorn, *Administrative Prescription & Imposition of Penalties,* 1970 Wash. U. L. Q. 265, 285.

ing violations of criminal laws by specific individuals. In short, the Commission very clearly exercises an accusatory function; it is empowered to be used and allegedly is used to find named individuals guilty of violating the criminal laws of Louisiana and the United States and to brand them as criminals in public." *Id.* at 427–28.

The Court characterized the Commission of Inquiry as an executive agency conducting public trials concerning criminal law violations, "exposing violations of criminal laws by specific individuals" and branding individuals "as criminals in public." *Id.* at 427, 428. The Court said that due process requires that the person under investigation be permitted to confront and cross-examine witnesses and to present evidence, within reasonable restrictions. The Court reserved the question whether all the procedural protections present in a criminal prosecution must be afforded in such an administrative proceeding, leaving the initial determination to the district court in light of the evidence adduced at trial because " '[w]hether the Constitution requires that a particular right obtain in a specific proceeding depends upon a complexity of factors.' *Hannah v. Larche, supra,* at 442." *Id.* at 430.

Unlike the Commission of Inquiry in *Jenkins,* the WERC is not limited in jurisdiction to investigating violations of the criminal laws. The WERC has broad jurisdiction over labor disputes. Its role is adjudicative and regulatory rather than investigatory, and any exposure of criminal activity is incidental to the WERC's legitimate and important functions in the labor relations field. We do not, therefore, view sec. 111.06(1)(l), Stats., as allowing fragmentation of proceedings against an accused or providing a shortcut for trying citizens in ways not envisaged by the framers of the federal or

state constitution. This is not a legislative attempt to eliminate constitutional rights guaranteed to those charged with criminal acts by channeling the substance and sanctions of criminal law into administrative agencies. The legislature did not give the WERC jurisdiction to enforce the law of perjury, and the WERC did not here seek to do so. The determination the WERC made and the sanctions it imposed constituted a legitimate exercise of its power and responsibility to regulate unfair labor practices.[32]

Were the WERC's jurisdiction a mere subterfuge for stigmatizing or punishing behavior already forbidden and punishable as criminal, the protections which Lieberman claims might very well be mandatory. However, we do not believe that as a matter of constitutional law an administrative body need always accord the full panoply of protections due the criminal accused before it can impose regulatory or remedial sanctions upon conduct also, and incidentally, subject to criminal punishment.

Nevertheless, we do not find *de minimis* the effect of the WERC's determination that Lieberman committed

---

[32] *See Furutani v. Ewigleben*, 297 F. Supp. 1163, 1164 (N.D. Cal. 1969); *Grossner v. Trustees of Columbia Univ.*, 287 F. Supp. 535, 551 (S.D.N.Y. 1968); *Goldberg v. Regents of the U. of Calif.*, 248 Cal. App.2d 867, 885, 57 Cal. Rptr. 463 (1967).

"The use of administrative sanctions is justifiable mainly in respect of matters already or typically committed to administrative supervision and control (*e.g.*, workmen's compensation, taxation, public utility regulation). Even if possibly valid, the power to impose penalties for anti-social behavior not directly related to an extensive regulatory scheme (*e.g.*, disorderly conduct, sedition, counterfeiting) should not be committed to administrative hands. In short, the administrative power to penalize should be an incident of other functions, rather than an activity standing alone . . . ." Gellhorn, *supra* note 31, at 285.

perjury in connection with an employment relations controversy. Not only was Lieberman's interest in his good name at stake in the unfair labor practice proceeding, but the WERC had the power to regulate his future behavior, to force him to pay out money, and to suspend rights otherwise granted him by state law. Lieberman had a property and liberty interest of which he could not be deprived without due process of law.[33]

Where procedural due process must be afforded, "the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). The inquiry is "intensely practical" and requires flexibility. *Goss v. Lopez*, 419 U.S. 565, 578 (1975); *Morrissey, supra* at 490.[34]

---

[33] Protected interests in property are created, and their dimensions defined, by state constitution, statutes or rules entitling the citizen to benefits. *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972). For a discussion of liberty interests compare *Paul v. Davis*, 424 U.S. 693, 701 (1976); *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971); *Goss v. Lopez*, 419 U.S. 565, 575–577 (1975), and *Smith v. Organization of Foster Families*, — U.S. — (1977). See Monaghan, *Of "Liberty" and "Property"*, 62 Corn. L. Q. 405 (1977); Van Alstyne, *Cracks in "The New Property": Adjudicative Due Process in the Administrative State*, 62 Corn. L. Q. 445 (1977).

[34] Despite Justice Douglas' objections (*see Hannah v. Larche*, 363 U.S. 420, 505 (1960) (dissenting opinion)), the Court has interpreted due process as dependent on the situation involved. ". . . The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation. . . . ' "[D]ue Process," unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.' It is 'compounded of history, reason, the past course of decisions . . . .' . . . .

"As these and other cases make clear, consideration of what procedure due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action." *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 (1961).

An accommodation must be made between administrative and individual interests, testing the adequacy of available procedures by balancing the interests of the state in limiting the protections it extends against the individual's interest in being afforded additional safeguards. The United States Supreme Court has summarized the criteria to be used in determining whether due process has been accorded in an administrative procedure:

". . . due process generally requires consideration of three distinct factors: first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge,* 424 U.S. 319, 335 (1976).

*See* Mashaw, *The Supreme Court's Due Process Calculus for Administrative Adjudication in Mathews v. Eldridge: The Three Factors in Search of a Theory of Value,* 44 U. Chi. L. Rev. 28 (1976).

Lieberman contends that he was entitled to a jury trial because the sixth amendment to the federal constitution as well as sec. 7, art. I of the Wisconsin Constitution provides that in "criminal prosecutions" the accused shall have the right to a jury trial. We have already determined that this was not a criminal proceeding.[35]

"Procedural due process is not unlike a legal chameleon that takes on its color and nature in accordance with the underlying substantive issue to be resolved." Tobriner & Cohen, *How Much Process is "Due"? Parolees & Prisoners,* 25 Hastings L. J. 801, 810 (1974).

[35] "The sixth amendment requires jury trials in all criminal prosecutions, and the seventh amendment requires jury trials in

Nevertheless, we note that even in criminal proceedings, trial by jury is not invariably required. Petty offenses need not be tried to juries.[36] Although one convicted of perjury can be imprisoned for up to five years, Lieberman was not convicted of perjury, and the WERC is not empowered to impose imprisonment. Lieberman does not explain the actual value a jury trial would have in the WERC proceedings other than to declare it "a constitutional right," an argument we do not accept here.

Lieberman further asserts that his case should have been heard by a lawyer-judge because "the Commissioners lacked expertise in the law of perjury." The WERC consists of three full-time members. No member is required to be an attorney. We are not persuaded that only an attorney could comprehend the perjury statute. The statute is no more complex than other matters which face the Commissioners and other non-

---

'suits at common law where the value in controversy shall exceed twenty dollars.' Administrative agencies do not impose criminal penalties, and proceedings before agencies are not suits at common law." 1 Davis, *Administrative Law Treatise*, sec. 8.16, p. 594 (1958).

[36] *See* Comment, *The Availability of Criminal Jury Trials Under The Sixth Amendment*, 32 U. of Chic. L. Rev. 311 (1965).

Juries are not constitutionally mandated for all trials in court on criminal or misdemeanor charges. In the interest of efficiency, petty offenses need not be tried to juries. *Duncan v. Louisiana*, 391 U.S. 145, 160 (1968). The Court has stated that the most relevant criterion in determining whether an offense is petty is the severity of the maximum penalty. *Baldwin v. New York*, 399 U.S. 66, 68 (1970). A maximum penalty of six months or less in jail is petty. *Id.* at 69.

Nor is a jury trial required if this proceeding is viewed as a civil proceeding. *General Drivers & Helpers Union, Local 662 v. WERB*, 21 Wis.2d 242, 251, 252, 124 N.W.2d 123 (1963). *See also Curtis v. Loether*, 415 U.S. 189, 194 (1974); James, *Right to a Jury Trial in Civil Actions*, 72 Yale Law J. 655, 655 (1963).

lawyer decision-makers. Indeed, the statute is one which a lay jury is asked to apply when it hears a criminal perjury prosecution.[37]

Lieberman contends that as the accused in an essentially criminal proceeding, he was entitled to a presumption of innocence which could only be overcome by proof beyond a reasonable doubt or, at the minimum, by clear, satisfactory and convincing evidence. Apparently, Lieberman finds constitutional infirmity in the standard of proof prescribed by the legislature. Section 111.07(3), Stats., provides that the party who has the burden of proof in an unfair labor practice proceeding must sustain that burden by "a clear and satisfactory preponderance of the evidence." Clearly, this is a lesser standard than "proof beyond a reasonable doubt," but the standard is not for this reason constitutionally infirm.

The accused in a criminal proceeding is constitutionally entitled to proof beyond a reasonable doubt because conviction carries with it possible imprisonment and substantial stigma. The accused in a juvenile delinquency proceeding is constitutionally entitled to proof beyond a reasonable doubt notwithstanding the fact that the proceeding is non-criminal because loss of personal liberty is a potential sanction. *In re Winship,* 397 U.S. 358 (1970). Lieberman was not the accused in a criminal proceeding, and his personal liberty was never at stake. We hold that neither the federal nor the state

---

[37] *Compare Gordon v. Justice Court,* 12 Cal.3d 323, 115 Cal. Rptr. 632, 525 P.2d 72 (1974) holding that non-attorney judges presiding over criminal trials of offenses punishable by a jail sentence violate the fourteenth amendment (Scrupp, Case Comment, 3 Am. J. Crim. Law 341 (1975) *with North v. Russell,* 427 U.S. 328, 96 S. Ct. 2709 (1976) holding that an accused subject to possible imprisonment is not denied due process when tried before a nonlawyer police court judge if a later trial de novo is available.

constitution requires proof beyond a reasonable doubt in a sec. 111.06 (1) (l) proceeding.[38]

We are left, then, with Lieberman's apparent contention that the constitution requires proof that an employer has committed perjury within the meaning of sec. 946.31 (1) (d) by evidence that is clear, satisfactory and convincing. Lieberman notes that this court has held that in certain classes of civil actions which involve such matters as fraud, undue influence, and acts which under other statutes would be considered criminal, public policy requires proof not merely by a preponderance of the evidence, but by evidence which is "clear, satisfactory, and convincing." *Madison v. Geier*, 27 Wis.2d 687, 692, 135 N.W.2d 761 (1965). Thus a greater degree of certitude is required before there is a finding

---

[38] "Two distinct functions are generally attributed to the requirement that the government prove guilt beyond a reasonable doubt. First, the rule is meant to affect the outcome of individual cases, reducing the likelihood of an erroneous conviction. Second, the rule is meant to symbolize for society the great significance of a criminal conviction. The *Winship* Court [397 U.S. at 363–64] invoked both purposes, reasoning that the rule was required both to protect the important interest of the accused individual in avoiding incarceration and stigma, and to command the respect and confidence of the community in the moral force of the criminal law." Underwood, *The Thumb on the Scales of Justice: Burdens of Persuasion in Criminal Cases,* 86 Yale L. J. 1299, 1306 (1977).

In another situation requiring administrative determination of criminal conduct, the states have differed as to burden of proof required in parole and probation revocation proceedings where the violator is charged with a crime. Several courts have held that the state need not demonstrate the defendant's guilt beyond a reasonable doubt. Note, *Revocation of Conditional Liberty for the Commission of a Crime: Double Jeopardy & Self-Incrimination Limitations,* 74 Mich. L. Rev. 525, 527, n. 13.

*See State ex rel. Flowers v. H & SS Dept.,* 81 Wis.2d 376, 387, 388, 260 N.W.2d 727 (1978), adopting the preponderance of evidence burden of proof in revocation cases.

against a defendant who will be subjected to the stigma attached to the commission of certain classes of acts.

However, in this instance the Wisconsin legislature has declared the public policy by providing that an employer not be found to have committed an unfair labor practice on less than "a clear and satisfactory preponderance of the evidence." The legislature has provided one standard of proof for all allegations of unfair labor practices, whether or not the unfair labor practice alleged could also be prosecuted in another forum as a crime.

We note that none of the briefs has attempted to describe the differences between preponderance of the evidence (greater weight of credible evidence, *see* Wis J I—Civil, 200), "clear, satisfactory and convincing" evidence (*see* Wis J I—Civil, 205 and "a clear and satisfactory preponderance of the evidence." sec. 111.07(3), Stats.). Clearly the legislative standard in sec. 111.07 (3) is not less than a preponderance of the evidence. And it is not necessary to decide here whether the legal description of the burden of proof in sec. 111.07(3) is the equivalent of either the "ordinary" or "middle" burden of proof in civil cases. Having considered the nature of the proceedings and the limited sanctions, we believe it is sufficient to hold that the legislative standard prescribed here does not violate the concepts of fair play and substantial justice embodied in the due process requirements of the state and federal constitutions.[39]

---

[39] For a discussion of the different terminologies used to describe the burden of proof in a civil case, see *Madison v. Geier*, 27 Wis.2d 687, 135 N.W.2d 761 (1965).

Wis J I—Civil, 200 sets forth the instruction for "ordinary" burden of proof as follows:

"The burden of proof . . . is to satisfy you, to a reasonable certainty, by the greater weight of the credible evidence . . . .

After reviewing the statutory provisions relating to WERC procedure, the rules of the WERC, and the record before us, we find that the WERC affords adequate and substantial protections to those who appear before it. Those safeguards go far beyond an opportunity to confront and cross-examine witnesses and to present evidence, which procedures were in issue in *Jenkins*. Indeed, the WERC procedures are substantially similar to those traditionally associated with the judicial process.

The proceedings concerning an unfair labor practice are initiated by a written complaint which is mailed to all parties in interest.[40] Any person who claims an interest in the controversy, as an employer, employee, or a representative of either, shall be made a party[41] upon application. The person against whom a complaint has been filed has the right to file an answer.[42] Notice

By the greater weight of the evidence is meant evidence which when weighed against that opposed to it has more convincing power. Credible evidence is evidence which in the light of reason and common sense is worthy of belief."

Wis J I—Civil, 205 sets forth the instruction for the "middle" burden of proof as follows:

"The burden of proof . . . is to convince you to a reasonable certainty, by evidence that is clear, satisfactory and convincing . . . ."

[40] Sec. 111.07(2)(a), Stats., Wis. Adm. Code sec. ERB 2.01 requires the complaint to be signed and sworn to; sec. 2.02 describes the content of the complaint; sec. 2.03 sets forth the service requirements.

Lieberman alleges that the procedure was deficient in that the complaint did not specify the statements which allegedly were perjured. It appears that the WERC procedure would have permitted him to make this objection and have the deficiency corrected.

[41] Sec. 111.07(2)(a), Stats.; Wis. Adm. Code sec. ERB 2.09.

[42] Sec. 111.07(2)(a), Stats. Wis. Adm. Code secs. ERB 2.04, 2.05 and 2.06 describe the contents of the answer, the filing and service of the answer and amendment of the answer. The parties may also make motions, Wis. Adm. Code sec. ERB 2.07.

of the hearing shall be given to each party.[43] The person complained of may appear in person or otherwise and give testimony.[44] Any party has the right to be present, to be represented by counsel, to call and cross-examine witnesses, and to introduce documentary or other evidence into the record.[45] The WERC has the power to issue subpoenas and administer oaths,[46] and

[43] Sec. 111.07(2)(a), Stats.

[44] *Id.*

[45] Wis. Adm. Code secs. ERB 2.10, 2.12.
Lieberman elected not to attend the hearing or be represented by counsel. Lieberman contends that his absence was the "key predicate" for his "conviction." Thus he claims he was denied the right to remain silent without having his silence construed against him. We do not believe there is merit to this claim.

Lieberman quotes the WERC's statement that, "[w]ith no evidence to controvert Complainant's testimony, it must be concluded that Respondent Lieberman's testimony was false and known by him to be false," out of context. The WERC's memorandum reviewed the evidence and determined that upon the evidence submitted by the union Lieberman had committed conduct proscribed by sec. 946. We also note that "it had long been recognized in Wisconsin that a person may invoke the fifth amendment in a civil case in order to protect himself from the use of such evidence against him in a subsequent criminal action; but if he did so, an inference against his interest might be drawn. *Molloy v. Molloy*, 46 Wis.2d 682, 687, 176 N.W.2d 292 (1970) (divorce case involving adultery allegation). *See* Note, *Revocation of Conditional Liberty for the Commission of a Crime: Double Jeopardy & Self-Incrimination Limitations*, 74 Mich. L. Rev. 525, 537, n. 60 (1976).

[46] Sec. 111.07(2)(b), (c) and (d), Stats. Sec. 111.07(2)(b), Stats. provides:
"(b) The commission shall have the power to issue subpoenas and administer oaths. Depositions may be taken in the manner prescribed by s. 101.02(14)(c). No person shall be excused from attending and testifying or from producing books, records, correspondence, documents or other evidence in obedience to the subpoena of the commission on the ground that the testimony or evidence required of him may tend to incriminate him or subject him to a penalty or forfeiture under the laws of the state of

parties may request that witnesses and documents be subpoenaed. Wis. Admin. Code, ERB 2.11. A full and complete record of the proceedings is kept by a reporter.[47] Proceedings are governed "by the rules of evidence prevailing in courts of equity and the party on whom the burden of proof rests shall be required to sustain such burden by a clear and satisfactory preponderance of the evidence."[48] The parties may object to the conduct of the hearing including any objection to the introduction of evidence.[49] A party shall be entitled to have a reasonable period for oral argument and to file a brief.[50] The WERC must make and file its findings of fact upon all the issues involved and its order which shall state its determination as to the rights of the parties.[51]

If a person fails or neglects to obey an order of the WERC, the WERC may petition the circuit court for

Wisconsin; but no individual shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing concerning which he may testify or produce evidence, documentary or otherwise, before the commission in obedience to a subpoena issued by it; provided, that an individual so testifying shall not be exempt from prosecution and punishment for perjury committed in so testifying."

[47] Sec. 111.07(3), Stats. Wis. Adm. Code sec. ERB 2.08 requires rulings and orders announced outside of a hearing to be in writing and those orally stated at the hearing to be included in the stenographic report of the hearing.

[48] *See* notes 38 and 39 and text at notes 38 and 39, *supra.*

[49] Wis. Adm. Code sec. ERB 2.14.

[50] *Id.*, sections 2.16, 2.17 and 2.18.

[51] Sec. 111.07(4), Stats.

We believe that the right to a reasoned explanation is very significant. This requirement promotes accountability, more thorough investigation and clear analysis. A decision that must be supported by a detailed statement of reasons is less likely to be taken lightly. *See* Rabin, *Job Security & Due Process: Monitoring Administrative Discretion Through a Reasons Requirement.* 44 U. of Chi. L. Rev. 60 (1976).

the enforcement of the order.[52] The WERC's order is subject to judicial review in the manner provided by the Administrative Procedure Act, chapter 227, Stats.[53]

It appears that the WERC procedures are less than the "full dress due process" required in trials of adult criminal defendants but more than the "medium due process" required in certain administrative procedures. See Goldberg v. Kelly, 397 U.S. 254 (1970) and Morrissey v. Brewer, supra. See also Wilkinson, Goss v. Lopez: The Supreme Court as School Superintendent 1975 The Supreme Court Review 25, 39–40.

Lieberman does not claim that the WERC deviated from the statutory procedure or that any of the procedural rights set forth above were denied him. He argues that the process granted was not sufficient. We conclude that the administrative procedures comport with due process. Our conclusion rests on the dual determination: (1) that this administrative proceeding is not a criminal proceeding; and (2) that all the constitutional protections required in criminal proceedings need not be granted in this administrative proceeding to assure reliability of fact finding or fairness.

We believe that the oft-quoted wisdom of Mr. Justice Frankfurter and Mr. Justice Douglas bears repeating here. Mr. Justice Frankfurter noted that differences in the origin and function of administrative agencies "preclude wholesale transplantation of the rules of procedure, trial, and review which have evolved from the history and experience of courts." FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 143 (1940). Nonetheless, we note Mr. Justice Douglas' warning that we must guard against allowing a citizen to be charged with a

[52] Sec. 111.07 (7), Stats.
[53] Sec. 111.07 (8), Stats.

criminal offense without according him full constitutional rights.[54]

Because there may be moral and status implications of a determination that conduct constitutes a crime, such determinations should be individualized, and great care must be taken that the procedures used afford a meaningful opportunity to avert error. Due process requires that the government utilize a reasonably reliable method to ascertain truth before it makes decisions based on adjudicative facts. The WERC procedure in the case at bar meets this test. We assume that the WERC will, in the limited instances where it must rely on sec. 111.06(1)(l), Stats., keep in mind the dangers of stigmatization and assiduously afford the parties all the protections accorded in the statute and rules. With this caution, we uphold the WERC procedures as not violating due process.

*By the Court.*—Order affirmed.

CALLOW, J., took no part.

---

[54] Justice Douglas decried short cuts "used more and more these days to 'try men' in ways not envisaged by the Constitution." *Hannah v. Larche,* 363 U.S. 420, 505 (1960) (dissenting opinion).